[Cite as *State v. Garibaldo*, 2025-Ohio-1093.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-23-1284

　　　　Appellee                            Trial Court No.  CR0202201360

v.

Juan Garibaldo                             **DECISION AND JUDGMENT**

　　　　Appellant                          Decided:  March 28, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Juan Garibaldo, appeals the

November 1, 2023 judgment of the Lucas County Court of Common Pleas, convicting

him of aggravated murder, aggravated burglary, and murder, and sentencing him to life

imprisonment without parole.  For the following reasons, we affirm.

# I. Background

{¶ 2} Juan Garibaldo was indicted for the March 2, 2022 stabbing death of his ex-girlfriend, S.S. He was charged with aggravated murder, a violation of R.C. 2903.01(B) and (G); aggravated burglary, a violation of R.C. 2911.11(A)(1) and (B); and murder, a violation of R.C. 2903.02(A) and 2929.02. The case was tried to a jury beginning July 10, 2023, but near the close of the State's case-in-chief, that trial ended in a mistrial after the State elicited testimony from one of its witnesses about an incident that the court had ruled inadmissible as unfairly prejudicial, then failed to ensure that a DVD played for the jury had been appropriately redacted in accordance with the court's evidentiary rulings and the parties' stipulations.

{¶ 3} The case was retried to a jury beginning October 23, 2023. The State presented testimony from 26 witnesses and admitted well over 200 exhibits. That evidence is summarized as follows.

## A. S.S. is found stabbed to death.

{¶ 4} On March 2, 2022, Toledo Police responded to a call of a person down at 1427 Royalton Road in Toledo, Lucas County, Ohio. Responding officers were directed to the rear entrance of a duplex, where they encountered the lifeless body of S.S., a 39-year-old woman, lying in a pool of blood at the landing between two sets of stairs. The glass pane of the door had been broken. A pair of eyeglasses was found under S.S.'s body.

**{¶ 5}** An autopsy revealed that S.S. suffered 58 stab wounds, mainly to her neck and face, which severed her carotid artery and jugular vein, partially severed her larynx, epiglottis, and thyroid gland, and caused her death. S.S. had defensive wounds on her arms and hands and broken fingernails, presumably sustained when she tried to protect herself against the attack. Fentanyl, methadone, and an antidepressant were present in S.S.'s blood, but did not contribute to her death.

**{¶ 6}** Detectives collected evidence at the scene, including the eyeglasses. They swabbed certain surfaces for DNA, including the dead bolt to the door. Additional evidence was collected at the autopsy, including S.S.'s fingernail clippings and swabs of what appeared to be bloody fingerprints on her ankles. The murder weapon was never found.

### B. Garibaldo's connection to S.S. surfaces.

**{¶ 7}** At the scene, officers ran S.S.'s name through LEADS and discovered that just the day before, Garibaldo made a police report, accusing S.S. of stealing paperwork for a dog he had purchased. His exchange with the officer who took the report was recorded on the officer's body camera. Garibaldo provided his phone number to the officer: 567-277-0613. He was wearing eyeglasses when he made the report. Those eyeglasses were similar in appearance to those found under S.S.'s body.

**{¶ 8}** Detectives discovered that S.S. had been working as an FBI informant for several years, frequently performing controlled drug buys. The day before her murder,

3.

S.S. contacted her FBI contact and expressed that she was concerned. She told him that Garibaldo was the subject of her concern.

{¶ 9} Detectives also learned that S.S., a drug user, had been a patient at a methadone clinic for the past two-and-a-half years. On the morning of her murder, S.S. visited the clinic at 6:04 a.m. and was there for only 10-13 minutes—long enough to take her dose of medication and complete a urinalysis. The morning of her murder, S.S. told her drug counselor that she was upset because of issues she was having with Garibaldo. She was trying to break off the relationship because Garibaldo was jealous and controlling. Her counselor described that S.S. was afraid. She asked him to check on her later that morning to make sure she was okay. He called her at 7:40 a.m. but she did not answer the phone.

{¶ 10} When S.S.'s body was discovered, her Home Depot work badge was found next to her body. Detectives spoke with representatives from Home Depot, who informed them that S.S. worked third shift and had left work at approximately 5:30 a.m. on March 2, 2022. Detectives also learned that on January 22, 2022, a male purporting to be a Home Depot employee called Home Depot and reported that S.S. had a knife and intended to inflict harm on her supervisor. S.S. was suspended from her employment pending an investigation, but the allegations were found to be unsubstantiated and she was permitted to return to work. A Home Depot human resources representative asked S.S. if she had safety concerns. S.S. told her that an ex-boyfriend, who she had testified against earlier that month, was in prison, and was having other people harass her. But

4.

when the H.R. representative investigated the incident involving S.S., she checked caller ID, which revealed that the call to Home Depot came from 567-277-0613—the same number Garibaldo gave when he made the police report on March 1, 2022, but a different number than the caller provided to Home Depot as a call-back number. Much to the caller's surprise, the HR representative called him back on the number taken from caller ID instead of the number he provided. S.S. was never advised that the phone call came from this number.

{¶ 11} Because Garibaldo's name had come up in all these contexts, detectives decided to bring him in for questioning. At first an interview was scheduled for two days later. However, detectives went to Toledo Steel, where Garibaldo worked third shift, and learned that he was not at work the previous evening. They also learned from Garibaldo's parole officer, who met with Garibaldo at 8:00 a.m. that morning, that he had fresh scratches on his face and hand. The decision was made to bring him in immediately for questioning. Martials apprehended Garibaldo at his sister's home on Brussels— where he most recently had been staying—and obtained a warrant to search his vehicle, a cream-colored Buick Lucerne.

**C. Garibaldo gives varying explanations for scratches on his hands and face.**

{¶ 12} On March 2, 2022, Garibaldo was scheduled to meet with his parole officer at 8:30 a.m. Sometime between 7:00 and 7:10 a.m., Garibaldo called his P.O. and asked if they could meet at 8:00 a.m. instead. They met at 8:00 at 301 Eastern. As soon as the P.O. got out of his vehicle, Garibaldo told him that if he had gotten there 15 minutes

5.

earlier, he would have seen Garibaldo get "pieced up," meaning he had gotten into a physical conflict. The P.O. observed a scratch across Garibaldo's face and a scratch on his hand, both of which were still bleeding. As to his face, Garibaldo told him that a person with a dog approached him, said "what did you say," then scratched him. As to his hand, he said he scratched himself on a nail. Garibaldo and the P.O. met for about ten minutes. About a half hour later, Garibaldo called and said that he wanted to change his address from Eastern to his sister's address on Brussels. That afternoon, the P.O. learned that Toledo police were looking for Garibaldo. He provided them the Brussels address.

{¶ 13} While Garibaldo told his P.O. that he was scratched by a guy with a dog, Garibaldo told a different story on social media. He posted on his Facebook page[1] at 12:24 p.m.: "I suck at fixing cars at least my own car.. I cut my hands all the hell changing a tire hit my face with my own tools."

{¶ 14} The detectives who questioned Garibaldo saw the scratches on his face and hands. Garibaldo told them that that morning he was standing outside his mother's house on Eastern waiting for his friend to drop off gas money and a kid was walking down the street with his dad just before 8:30 a.m. and attacked him unprovoked, scratching his face. He told them he had scratches on his hands because as he was going into his mother's house, he got cut by some screws that were protruding from the door.

---

[1] The Facebook page is listed under the name Raco Gottibaldo. A longtime friend of Garibaldo testified that his nickname is Raco and Raco Gottibaldo is his Facebook page. The profile picture is of Garibaldo.

6.

{¶ 15} Garibaldo's sister, with whom he lived, testified at trial that she did not see a cut on Garibaldo's face the morning of March 2, 2022, and did not see any blood. The State played a recording, however, where she acknowledged that Garibaldo had scratches on his face. In that video, recorded shortly after 6:00 p.m. on the day of the murder, she told detectives that Garibaldo told her husband that the scratches were caused by a jack; on Facebook, he said he scratched himself changing a tire; and when they were at their mom's, he told his mom he got in a fight. Garibaldo asked his mom for Vaseline for cuts on his fingers. His sister testified that she saw him walk in and out the door at their mom's house and did not see him cut his hand.

{¶ 16} Garibaldo's brother-in-law testified that Garibaldo returned to the home on Brussels in the early afternoon of March 2, 2022. Garibaldo told him that he got into a fight and asked for some Vaseline. He saw the scratch on Garibaldo's face as well, but did not ask any questions about it because he didn't want to know.

{¶ 17} Finally, Garibaldo left a voice mail on S.S.'s phone at 1:59 p.m. She had been dead several hours by then. He said that just before he met with his P.O., "a black dude" came up to him and said "what up, cuz?" and scratched up his face. He said after that, he cut his hand on the door. He added: "You know how I get when I see blood. I gag and gag and gag."

**D. Garibaldo's whereabout are explored.**

{¶ 18} On the morning of March 2, 2022, S.S.'s neighbor—whose house is next door to the garage and rear entrance to the duplex—heard a woman scream and the sound

of glass breaking. She looked outside, thinking her car had been broken into, then called her husband. She testified that she heard the scream and the shattered glass at 6:13 a.m. Her husband testified that he received the call between 6:00 and 6:20 a.m. The State's position was that S.S. was ambushed at the time her neighbor heard the scream and the sound of glass breaking.

{¶ 19} It was also the State's position that S.S.'s killer lay in wait and there were places on the property he could have hidden. S.S.'s duplex is located at the northwest corner of Royalton and Birchall Roads. At 5:45 a.m., home security cameras at 4203 Birchall (six doors down from S.S.'s duplex), 4207 Birchall (five doors down from S.S.'s duplex), and 4215 Birchall (three doors down from S.S.'s duplex) captured a heavy-set man walking alone wearing a hoodie with the hood up, heading north towards Royalton. People who know Garibaldo—his sister, his longtime friend, and one of the detectives who observed Garibaldo's manner of walking—testified that the gait of the man in the video was consistent with Garibaldo's gait. The detective testified that their builds were also similar.

{¶ 20} Although Garibaldo generally worked third shift, detectives confirmed that Garibaldo did not work the evening before or the morning of the murder. His employer's records show that he was "absent unpaid" for February 28, March 1, and March 2, 2022.

{¶ 21} When Garibaldo was questioned by detectives in the late afternoon of March 2, 2022, he denied being at S.S.'s house. He told the detectives that he never goes anywhere without his phone and encouraged them to check his GPS because they would

8.

see that he had been home the previous day and night. He said that his sister could verify this because he had been staying with her. Garibaldo emphasized to the detectives that he had not left the house without his sister. Around 7:00 that morning, he took her over to their mother's house when he had to meet with his P.O.

{¶ 22} Without having been told what time S.S. had been murdered, Garibaldo told detectives that he was in his bedroom sleeping when S.S. died. Garibaldo insisted that he was just getting up at 6:30 a.m., left the house at 7:00, and met his P.O. at 8:00 a.m. He maintained that he was nowhere in the area of the duplex and had not left the house. He indicated that he had last seen S.S. on Monday morning when he got off work and had texted with her all day.

{¶ 23} Contrary to what Garibaldo told police, video footage from his sister's neighbor's home security camera showed Garibaldo's car pulling into the driveway at 6:32 a.m. It showed him pulling out of the driveway again at 6:37 a.m. There was no evidence establishing what time Garibaldo's vehicle first left the driveway or what time it returned before he picked up his sister to go to his mom's house. Significantly, even though Garibaldo told detectives that he doesn't go anywhere without his phone, cell site analysis showed that Garibaldo's phone remained at the Brussels Street address, or very nearby, from 4:18 a.m. to 6:56 a.m. The Brussels address is 1.1 miles from S.S.'s duplex on Royalton.

{¶ 24} Garibaldo's sister testified that sometime between 6:30 and 6:40 a.m., she heard her brother go in and out the back door at least four times, which was out of the

9.

ordinary. She remarked to her husband that her brother was being weird. At around 7:15 a.m., Garibaldo drove her to his mother's house so they could discuss funeral arrangements for their sister, who had died on February 28, 2022. While at their mother's house, Garibaldo asked for cleaning spray so he could clean his tires. He left their mother's house around 9:00 a.m.

{¶ 25} Garibaldo's brother-in-law testified that Garibaldo started a load of laundry early that morning before he and his sister left to go to their mother's house. Home security cameras from the neighbor's house show that Garibaldo and his sister left the Brussels Street home at 7:19 a.m. When detectives executed a search warrant at the home, they found an orange sleeveless shirt, a navy hooded sweatshirt with a Hanson logo on the back, and two rugs in the washer. Garibaldo's brother-in-law testified that the rugs did not belong to the family. One of the officials who executed the warrant described that the items found in the washer had been submerged in water and were wet and sandy. There were red stains on the orange t-shirt. A bottle of bleach was found in the trunk of Garibaldo's cream-colored Buick Lucerne, as was a black latex glove.

{¶ 26} On March 2, 2022, at 6:56 a.m., Garibaldo texted S.S. to tell her that he left his eyeglasses on her fireplace. Three minutes later, Garibaldo called a friend using Facebook Messenger.

{¶ 27} Garibaldo's friend testified at trial. She said that she had known Garibaldo for 19 years and had dated him. In October of 2021, she and Garibaldo were regularly hanging out together. They were supposed to go out on February 13, 2022, but Garibaldo

10.

did not show. They stopped talking and she deleted Garibaldo's phone number. On February 28, 2022, the friend reached out to Garibaldo on Facebook after learning that Garibaldo's younger sister had died. On March 1, 2022, they briefly messaged one another over Facebook Messenger.

{¶ 28} On March 2, 2022, at 6:59 a.m., Garibaldo called this friend using Facebook Messenger, which the friend said was unusual. Garibaldo sounded nervous, anxious, and out of breath. He told her that someone owed him money, so he set their car on fire. He thought he may have been caught on a Ring camera. Garibaldo asked her to say she had been with him if the cops ever asked her where he was. Later that morning, Garibaldo asked her to call him on his phone. She asked for his number. He said it was 567-277-0613. The friend testified that when she spent time with Garibaldo in February, he asked her a couple of times to drive him by the duplex on Royalton. She assumed that the car Garibaldo set on fire belonged to the person who lived on Royalton. A detective who testified said that there were no car fires reported that morning.

{¶ 29} A man who lived at the corner of Overland Parkway and Royalton testified that he walks his dog between 5:15 and 6:00 a.m. every morning. He and his dog walked past the duplex at the corner of Birchall and Royalton and his dog barked because it saw a person walk towards the back of the duplex. He estimated that this was between 5:20 and 5:30 a.m. The person he saw was heavyset and was wearing dark clothing, possibly a Carhartt kind of jacket, pants, and a ski cap, and he was wearing work boots. The person was startled when the dog barked and he mumbled something—it was a male

11.

voice. While the dog walker estimated that he saw the man between 5:20 and 5:30 a.m., he was confident that he had finished walking the dog before 6:00 a.m. because he had a 6:00 a.m. alarm set on his phone and it went off before he sat down to watch the 6:00 a.m. news. When this witness heard about the murder, he told his son—a police officer—about seeing the man that morning at the duplex.

{¶ 30} A woman who lived at 4207 Birchall Road—an occupant of one of the homes with a security camera—testified that she got home around 5:45 a.m. on March 2, 2022. As she was getting home, she saw a guy walking past her house. It was still dark, so she waited for him to pass before getting out of the vehicle. She described that the man was wearing a dark hoodie with the hood up.

### E. Detectives narrow in on Garibaldo.

{¶ 31} The lead detective on the case testified that Garibaldo was not initially a suspect, but was a person of interest because his name had come up a couple of times. They spoke with Garibaldo and he agreed to talk with detectives two days later. Detectives believed that the murder occurred sometime between 6:10 and 6:30 a.m. Once they learned that Garibaldo had not gone to work that day, and after hearing from Garibaldo's P.O. that Garibaldo had fresh scratches on his face and hands that morning, they decided he needed to be questioned immediately. Garibaldo became a suspect.

{¶ 32} Right before they interviewed Garibaldo, detectives watched the home security footage. When Garibaldo was brought to the station, they observed his gait and

12.

believed that he could be the person in the recordings. They also observed the fresh scratches on his face and hands.

{¶ 33} The substance of Garibaldo's statements is described above. Detectives also asked Garibaldo what should happen to S.S.'s murderer. Garibaldo told them that the person should receive due process and a jury should decide the person's fate. The detectives found this response unusual.

{¶ 34} Garibaldo's car was searched. There appeared to be drops of blood on several areas of the car. Those spots were swabbed for testing.

#### F. The State tests the evidence collected.

{¶ 35} Detectives submitted several items of evidence for DNA testing. They submitted the sweatshirt found in the washing machine, the eyeglasses found near S.S.'s body, and S.S.'s fingernail clippings. They also submitted swabs of S.S.'s ankles and the dead bolt latch to S.S.'s duplex, as well as swabs of the interior and exterior driver's door handles, backseat, gear shift selector, steering wheel, and door frame of Garibaldo's vehicle—the suspected drops of blood.

{¶ 36} There was no blood found on the sweatshirt. The State offered evidence that because the sweatshirt had been laundered, blood and DNA could have been washed away.

{¶ 37} The eyeglasses tested presumptive positive for blood. There was some male DNA on the nose and earpieces. The earpieces contained a mixture of DNA

13.

consistent with Garibaldo and S.S.'s DNA. The estimated proportion of the population that could not be excluded as contributors to the mixture of DNA was one in 20,000.

{¶ 38} S.S.'s fingernails tested presumptive positive for blood, but the only DNA identified was hers. The State offered evidence that because of the large amount of the victim's blood, others' DNA could not be identified even if it was present.

{¶ 39} The swabs from S.S.'s ankles and the deadbolt lock tested presumptive positive for blood. There was a mixture of DNA identified. S.S. was identified as the major contributor. Garibaldo was not the major contributor. There was male DNA that was not of sufficient quality for comparison.

{¶ 40} No blood was identified on the interior door handle or steering wheel of Garibaldo's vehicle. The remaining swabs from the vehicle tested presumptive positive for blood. S.S.'s DNA was excluded from the swab of the B pillar of the front left interior door frame; Garibaldo's DNA was identified in that swab. S.S.'s DNA was identified in the swabs from the rear seat, the rear exterior left door handle, and the gear shift selector. Garibaldo's DNA was also identified in the swab of the rear seat and the gear shift selector. Garibaldo was not the major contributor of DNA from the rear exterior left door handle, but there was some male DNA that was not of a sufficient quality for comparison.

{¶ 41} Further analysis was performed on the swab of S.S.'s right leg specific to the Y chromosome that was detected. The Y-STR DNA profile was consistent with Garibaldo. Y-STR testing allows a DNA profile to be narrowed down to a male lineage,

14.

but not to the specific person within that male lineage. Here, neither Garibaldo nor his paternal male relatives could be eliminated as the source of that Y-STR DNA. That profile was observed two times in the Y-Chromosome Haplotype Database of 29,207 profiles and is not expected to occur more frequently than one in 4,639 men.

{¶ 42} Although several items tested presumptive positive for blood, BCI did not do tests to confirm that these were blood stains. BCI witnesses conceded that the DNA that was found could have been touch DNA as opposed to blood DNA.

{¶ 43} S.S. and Garibaldo's cell phones were examined. There were texts between them on Monday, February 28, 2022, Tuesday, March 1, 2022, and Wednesday, March 2, 2022—the day of S.S.'s murder.

{¶ 44} At 7:50 a.m. on February 28, 2022, S.S. texted Garibaldo: "I hate you. Don't [e]ver call me again." At 7:54 a.m., she texted: "You're sick." At 8:06 a.m., she texted: "I fucking hate you." Garibaldo texted S.S. on February 28, 2022 at 9:16 p.m. and said: "Hope you['re] glad you got [w]hat you wanted [w]ith me gone so you don't gotta sneak around no more."

{¶ 45} S.S.'s next door neighbor testified that on March 1, 2022, he went out to have a cigarette around 7:45 to 8:00 a.m. He saw S.S. arguing with a heavy-set Hispanic man. The man's white four-door car was in the driveway—the neighbor had seen the car there before. He heard the man ask S.S. why she didn't call him. S.S. responded that she had been sleeping. The neighbor stopped listening to the argument, but it sounded to him that it would have been a bigger argument if he had not been standing there.

15.

{¶ 46} On March 1, 2022, at 2:38 p.m., Garibaldo took a picture of the front of S.S.'s duplex. Between 5:26 and 5:32 p.m., Garibaldo and S.S. engaged in the following text exchange:

Garibaldo: The dog was sold to me[.] I have the cash app where I sent the money and the text from between us[.]

S.S.: That's funny because his registered papers are in my name.

Garibaldo: Since I paid for him they should be in my name[,] not yours[,] and I'm gonna need them in my name[.]

S.S.: That's not going [t]o happen. Dustin would've never sold you that dog for $200[.] [H]e did it for me because we're friends.

Garibaldo: I nvr said it was a gift[.] I wanted to get him so I could have one of my own to[o.]

S.S.: Well that's funny. [T]hat's not what you said. Leave me the fuck alone[.] There's nothing to talk about ever again. As I said my daughter hates you now.

Garibaldo: I never said anything to you about a gift. I need my money back for him then I'll go get the puppy back[.]

{¶ 47} On March 2, 2022, at 6:56 a.m., Garibaldo wrote to S.S.: "I'm going downtown to [get] copies of police report. I want my stuff that [I] bought for you[.] [M]y glasses are on the fireplace[.] I left them thr last time I was thr."

### G. S.S. had ex-boyfriends with criminal histories.

{¶ 48} March 2, 2022, was not the first time that S.S. was the victim of a violent assault. On January 25, 2021, she was stabbed by an ex-boyfriend, Alejandro Herrera, who also held her captive for two days. He was convicted of assaulting her and was

16.

incarcerated at the time of her murder. S.S. testified against him at trial in December of 2021. This is the man S.S. referred to when her employer asked if she had any safety concerns.

{¶ 49} Another ex-boyfriend, Charles Campos, was also serving time in prison for drug and gun offenses. When detectives questioned Garibaldo, he mentioned both Herrera and Campos, implying that one of them may have perpetrated S.S.'s murder.

{¶ 50} Although he was incarcerated, S.S. talked to Campos on the phone frequently. One of S.S.'s friends said that Campos was S.S.'s boyfriend at the time of her death. He was scheduled to be released soon after S.S.'s murder and S.S. was excited about that.

### H. The defense advances alternate theories and accuses detectives of having tunnel vision.

{¶ 51} Garibaldo's cross-examination focused on what he claimed was tunnel vision on the part of the investigating detectives. His case-in-chief consisted of reading aloud S.S.'s trial testimony from Herrera's December 8, 2021 jury trial. According to that testimony, Herrera stabbed S.S. in the leg, and held her captive for more than two days. Herrera was convicted of felonious assault and tampering with evidence. On February 11, 2022—just 17 days before S.S. was murdered—Herrera was sentenced to a prison term of nine to 12 and one-half years.

{¶ 52} In his closing argument, Garibaldo highlighted for the jury other sources of danger to S.S. He emphasized that not only had S.S. worked with the FBI doing

17.

controlled drug buys, Herrera *discovered* that S.S. was doing this undercover work and threatened to expose her, causing S.S. to fear for her life. S.S. had even told her employer in January of 2022, that Herrera was having people stalk and harass her because he could not do it himself.

{¶ 53} Although Garibaldo acknowledged that caller ID showed that the false report made to S.S.'s employer in January of 2022, was made from his phone number, he suggested during closing arguments that Herrera's associates could have cloned Garibaldo's phone and made the call. He pointed out that during this time frame, Garibaldo and S.S. had exchanged loving text messages, insisting that it didn't make sense that Garibaldo would try to sabotage S.S. when those calls to Home Depot were made. On October 19, 2021, for instance, S.S. told Garibaldo that she loved him and wanted to be with him. On December 20, 2021, and again on January 2, 2022, she told him that she was not sleeping with anyone else. On January 30, 2022, she told him that she wanted to have sex with him. S.S. hinted to Garibaldo that she wanted an engagement ring from him and said that she had talked to her daughter about that. Garibaldo responded "maybe in the near future" and sent her a picture of an engagement ring. S.S. told Garibaldo that her daughter was excited to meet him and believed she had finally found a good man.

{¶ 54} As to the DNA evidence, Garibaldo maintained that because S.S. and Garibaldo had dated, it made sense that her DNA would be in his car and his DNA would be in her house—especially on his eyeglasses, which he suggested S.S. may have put in

18.

her purse, intending to return them to him. He emphasized that the swabs that were analyzed tested presumptive positive for blood, but officials never confirmed that it was, in fact, blood. Garibaldo insisted that the DNA found in his car could have been touch DNA rather than DNA from S.S.'s blood. Garibaldo also questioned detectives about a bottle of hot sauce found in the back seat of Garibaldo's car, near the blood stain that was swabbed. He suggested that spots the detectives saw could have been hot sauce.

{¶ 55} Garibaldo addressed the home security recordings. He maintained that the face of the man in the videos could not be discerned, and the large Hanson logo on the back of the sweatshirt found in the washing machine is not visible in any of the videos. He questioned why there was video evidence of the man going *toward* S.S.'s duplex early on March 2, 2022, but there was no video evidence of the man *leaving* S.S.'s home. Garibaldo also pointed out that the home security recordings do not show what time Garibaldo's vehicle left the house on Brussels before returning at 6:32 a.m. on March 2, 2022.

{¶ 56} Finally, Garibaldo insisted that the fight over the paperwork for the dog was not motive for him to murder S.S. Rather, Garibaldo filed a police report to resolve the dispute in an orderly and nonviolent manner. He posited that S.S.'s cooperation in the trial against Herrera provided Herrera a stronger motive to kill S.S. Garibaldo insisted that detectives developed tunnel vision and neglected to pursue other leads.

{¶ 57} For their part, the State's witnesses claimed that during the course of the investigation, they never uncovered any leads suggesting that S.S.'s death was related to

19.

her activities as a confidential informant or to her relationship with Herrera or Campos. The lead detective did not believe that it was necessary to pursue Herrera or Campos as possible suspects because they were both incarcerated and none of the evidence pointed to anyone other than Garibaldo.

## I. The jury finds Garibaldo guilty and the court sentences him.

{¶ 58} The jury found Garibaldo guilty of all counts. The trial court found that the convictions merged for purposes of sentencing. The State elected to have Garibaldo sentenced on Count 1, aggravated murder. The trial court sentenced Garibaldo to life in prison without the possibility of parole.

{¶ 59} Garibaldo appealed. He assigns the following errors for our review:

I.      The convictions are contrary to the manifest weight of the evidence, and are insufficient of evidence[.]

II.     The trial court erred when it permitted a preemptive (sic) strike of a juror after the state failed to provide a legitimate non-racial purpose for the strike, denying Mr. Garibaldo his equal protection rights under the United States Constitution[.]

III.    The trial court erred in determining that the mistrial that it declared was without cause: it was with cause, was misconduct, and the case should have been dismissed with prejudice[.]

## II. Law and Analysis

{¶ 60} In his assignments of error, Garibaldo challenges the weight and sufficiency of the evidence, the use of a peremptory challenge to strike a Black juror, and the decision to retry him after the first trial ended in a mistrial. We address each of Garibaldo's assignments in turn.

20.

## A. Sufficiency and Weight of the Evidence

{¶ 61} In his first assignment of error, Garibaldo argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. He concedes that that there is a significant amount of circumstantial evidence against him, but he maintains that his guilt is not the only inference that one can draw from the facts. Garibaldo insists that the lead detective failed to investigate other possible suspects and conducted tests that only determined the presumptive presence of blood when it should have confirmed whether blood was present. He contends that this was necessary because the presence of S.S.'s touch DNA in his car was to be expected given that S.S. and Garibaldo had dated.

{¶ 62} The State responds that circumstantial and direct evidence possess the same probative value and contends that Garibaldo's argument ignores Ohio Supreme Court precedent. It emphasizes that similar arguments were raised and rejected in *State v. Roberts*, 2023-Ohio-142 (6th Dist.). The State insists that Garibaldo's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence.

### 1. Sufficiency

{¶ 63} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations

21.

omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 64} Under R.C. 2903.01(B), "[n]o person shall purposely cause the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit . . . aggravated burglary." Under R.C. 2911.11(A)(1), "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure . . . when another person . . . is present, with purpose to commit in the structure . . . any criminal offense, if . . . [t]he offender inflicts, or attempts or threatens to inflict physical harm on another." And under R.C. 2903.02(A), "[n]o person shall purposely cause the death of another . . . ."

{¶ 65} Garibaldo does not challenge any specific element of the offenses and, in fact, concedes that there was much circumstantial evidence to support the elements of these offenses, including the element of identity. Indeed, there was. The State presented the following evidence that, if believed, would support the elements of the offenses of which Garibaldo was convicted:

- S.S. died after being stabbed 58 times;

- The glass door was broken to gain entry into her home;

22.

- Garibaldo's eyeglasses were found under S.S.'s body;

- Garibaldo and S.S. had been arguing for the three days before her murder;

- The day before and the day of her murder, S.S. told her drug counselor and her FBI contact that she feared Garibaldo;

- The day before her murder, S.S.'s neighbor saw her arguing with a man with the same build as Garibaldo who drove a vehicle like Garibaldo's;

- Home security cameras near S.S.'s house recorded a man— who according to Garibaldo's sister, his longtime friend, and the detective who interviewed him, had a gait and a build like Garibaldo's—walking toward S.S.'s house before 6:00 a.m.;

- A man walking his dog saw a man near the rear of S.S.'s duplex before 6:00 a.m.;

- The murder was committed sometime between 6:10 and 6:30 a.m.

- Garibaldo did not report for work at Toledo Steel, where he worked third shift;

- Garibaldo told detectives that he was at home until he took his sister to his mom's house after 7:00 a.m., but home security cameras recorded Garibaldo's car driving into the driveway at 6:32 a.m. and pulling out of the driveway at 6:37 a.m. Garibaldo's sister also testified that around 6:30 a.m., Garibaldo walked in and out of the house at least four times;

- Garibaldo was recorded while making a police report on March 1, 2022, and he had no scratches on his face and he was wearing eyeglasses that looked like the eyeglasses found near S.S.'s body;

- Garibaldo had still-bleeding scratches on his face and hands when he met with his P.O. at 8:00 a.m., approximately 90 minutes after S.S. was murdered;

- Garibaldo offered at least four different explanations for how he sustained scratches to his face and hands;

- When asked where he was when S.S. was murdered, Garibaldo told detectives he was in bed sleeping, even though he had not been told when S.S. was murdered;

- Garibaldo called his ex-girlfriend at 6:59 a.m., sounded out of breath, and asked her to say he was with her if police asked. While he told his ex-girlfriend that he had set a car on fire, a detective testified that no car fires had been reported that morning;

- Even though Garibaldo's car was recorded coming and going at 6:32 a.m. and 6:37 a.m., respectively, cell site analysis showed that his phone was at or very near his sister's house from 4:18 a.m. to 6:56 a.m., suggesting that Garibaldo purposely left it there because he knew it could be tracked;

- Garibaldo attempted to account for the whereabouts of his eyeglasses by texting S.S. after she had been murdered;

- Garibaldo attempted to account for the scratches to his face and hands—and to suggest a reason why he couldn't have committed the murder—by leaving a voicemail for S.S. explaining that he had been attacked and remarking about how the sight of blood makes him gag;

- S.S.'s DNA was identified in swabs taken of stains in Garibaldo's car that tested presumptively positive for blood;

- Garibaldo (or his paternal male relatives) could not be eliminated as the source of Y-STR DNA taken from S.S.'s bloody ankle;

- Garibaldo started a load of laundry early in the morning on March 2, 2022, consisting only of a shirt with red stains on it, a navy hoodie, and two rugs that didn't belong to his sister's family;

- Less than six weeks before S.S. was murdered, a call was made from Garibaldo's phone number falsely reporting to S.S.'s employer that she was carrying a knife and intended to harm her supervisor; and

- In the hours after the murder, while at his mother's house to plan his sister's funeral, Garibaldo asked his mother for cleaning spray to clean off his tires. He had bleach in his trunk as well.

{¶ 66} Garibaldo does not dispute that under the current legal standard for evaluating the sufficiency of the evidence, this evidence supports his conviction. He argues that Ohio should re-adopt a standard that the Ohio Supreme Court explicitly overruled in 1991. That standard would require that where a conviction is based entirely on circumstantial evidence, the State must show that the evidence is "irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt." *State v. Kulig*, 37 Ohio St.2d 157 (1974), syllabus.

{¶ 67} In *State v. Jenks*, 61 Ohio St.3d 259 (1991), the Ohio Supreme Court examined the sufficiency standard in depth and decided that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *Id.* at paragraph one of the syllabus. As such, "[w]hen the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *Id.* Moreover, on appeal, "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Id.* at paragraph two of the syllabus. To that end, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

25.

crime proven beyond a reasonable doubt." This has remained the standard for almost 34 years. In adopting the standard, the court unambiguously overruled *Kulig*.

{¶ 68} "Stare decisis is a cornerstone of our legal system." *State v. Williams*, 2024-Ohio-1433, ¶ 17, citing *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 518 (1989). "It 'compels a court to recognize and follow an established legal decision in subsequent cases in which the same question of law is at issue.'" *Id.,* quoting *State v. Henderson*, 2020-Ohio-4784, ¶ 28. We are bound by stare decisis to apply the legal standard adopted by the Ohio Supreme Court. Any change to the legal standard must come from the Ohio Supreme Court. We conclude that the State presented sufficient evidence to support Garibaldo's convictions.

### 2. Manifest Weight

{¶ 69} As an alternative to adopting a new legal standard for sufficiency of the evidence, Garibaldo suggests that the standard for which he advocates may be better suited as a consideration of a manifest-weight challenge. His main complaints are that (1) detectives developed tunnel vision that kept them focused on Garibaldo instead of continuing to investigate to rule out the involvement of Herrera, Campos, or others; (2) detectives should have investigated whether S.S.'s murder was related to her role as an FBI confidential informant; (3) the swabs from his vehicle were not tested to *confirm* the presence of blood—they were only shown to be *presumptively* positive for the presence of blood; (4) if the swabs from the vehicle contained only touch DNA and not blood, the presence of S.S.'s DNA in his vehicle would not be inculpatory given that Garibaldo and

26.

S.S. dated and S.S. had been in his car; (5) testing may have shown that some of the stains were from hot sauce that was in his vehicle; and (6) the Y-STR DNA identified in the swab of S.S.'s ankle may occur in one in every 4,639 men and, therefore, is not conclusive.

{¶ 70} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 71} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each

27.

witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 72} In weighing the evidence, the jury was free, of course, to consider the shortcomings in the State's evidence, including those identified by Garibaldo. These shortcomings were well emphasized by defense counsel on cross-examination and in closing arguments. But the manifest-weight standard as it exists does not require us to reverse a conviction just because there were "loose ends" left by the State or because the State focused its investigation on Garibaldo and did not pursue other suspects. Any change to the standard must come from the Ohio Supreme Court. Based on the evidence that was presented to the jury, we cannot say that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that Garibaldo's conviction must be reversed and a new trial ordered.

{¶ 73} We find Garibaldo's first assignment of error not well-taken.

### B. *Batson* Challenge

{¶ 74} In his second assignment of error, Garibaldo, who is Hispanic, argues that the State lacked a legitimate non-racial purpose for using a peremptory challenge to strike

28.

a Black juror (Juror No. 12). He acknowledges that the State provided a non-racial rationale for challenging the juror, but he maintains that the rationale was not applied consistently to a white juror.

{¶ 75} The State responds that it offered a race-neutral explanation for striking Juror No. 12. It points out that Juror No. 8—who the State also struck—expressed similar sentiments, and Garibaldo made no *Batson* objection when Garibaldo exercised a peremptory challenge to strike Juror No. 8, suggesting that Juror No. 8 was not a member of a minority group. It insists that there was no systematic preclusion or disparate treatment of minorities from the jury panel and there was a legitimate concern about Juror No. 12's qualifications as a juror.[2]

{¶ 76} In *Batson v. Kentucky,* 476 U.S. 79, 85-86 (1986), the U.S. Supreme Court acknowledged that a defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." This right is violated where the prosecution challenges potential jurors based only on their race or on the assumption that as a group, Black jurors are unable to be impartial in considering a case against a Black defendant. *Id.* at 89. To protect against violations of this right, courts perform a three-step analysis.

{¶ 77} Where the State exercises a peremptory challenge to strike a member of a cognizable racial group, the defendant must first make a prima facie case of racial

---

[2] The State also responds to Garibaldo's criticism that the venire was comprised heavily of suburbanites and included very few Toledo residents. We decline to address this criticism because Garibaldo never developed this argument—it was merely "noted."

discrimination. *State v. Bryan,* 2004-Ohio-971, ¶ 106. If he or she successfully does so, the burden shifts to the State to provide a neutral explanation for exercising the challenge. *State v. Thompson,* 2014-Ohio-4751, ¶ 51. Then, considering all the circumstances, the trial court must determine whether the defendant has proven purposeful racial discrimination. *Id.* at ¶ 52. Because this is largely an issue of credibility, an appellate court must defer to the trial court's decision unless it is clearly erroneous. *Id.* at ¶ 53. If the appellate court determines that there has been a *Batson* violation, this error will be deemed structural. *Id.*

{¶ 78} This issue arose at trial as follows. The State's attorney posed a hypothetical for the venire. She asked them to consider a scenario in which thousands of fans are at a baseball game and a young girl comes out to sing the national anthem. Instead of grabbing the microphone, the girl takes a baseball out of her pocket and throws it in the umpire's face, breaking his nose. The State's attorney asked the jurors if under these circumstances they would expect the State to send the baseball for DNA testing and fingerprinting or whether they would be satisfied with hearing from witnesses who saw the incident occur. Juror No. 12 said that she would prefer that the baseball be sent for testing "just to follow all the proper procedures" and because even though "everyone saw her with the ball, it's just proper protocol to follow all the steps."

{¶ 79} The State then asked more specifically whether jurors believed the State must present DNA evidence to prove its case beyond a reasonable doubt. Juror No. 3

30.

said "yes."[3]  Juror No. 9 said "eyewitness testimony."  Juror No. 2 said that in the original scenario, because thousands of people had witnessed the incident, there was no need to spend the time and money for DNA evidence and fingerprinting.  Juror No. 8 said that he would need something other than eyewitness testimony because based on his background of having "multiple degrees in psychology, eyewitness testimony alone is deeply flawed and never proven to be accurate so [he] would need something else other than eyewitness testimony."

{¶ 80} When it came time to select the jury, the State exercised peremptory challenges to strike Juror No. 8, then Juror No. 12.  Defense counsel stated that Garibaldo is Hispanic and Juror No. 12 is Black, so they are both minorities.  It then asked for a nonracial reason for striking Juror No. 12.  The State's attorney explained that she had used her challenge to strike Juror No. 12 because she said yes when asked if she would require DNA forensic evidence to be able to reach a guilty verdict.  Defense counsel responded that the juror said that she would prefer to have all the evidence but she would not necessarily require it.  He also argued that Juror No. 10 was white and had also said that he would prefer to have DNA and forensic evidence.  The State's attorney disputed that Juror No. 10 had made that comment.  The Court agreed with the State and allowed the State to exercise the peremptory challenge.

---

[3] The State claims that Juror No. 3 was only asked about the reasonable-doubt standard—not DNA evidence.  It apparently overlooked Juror No. 3's response to the question about DNA evidence on page 60 of the trial transcript.

31.

**{¶ 81}** On appeal, Garibaldo argues that trial counsel must have misspoken when he said that Juror No. 10 shared the same views as Juror No. 12—he claims that defense counsel must have meant Juror No. 3. There are several problems with Garibaldo's position.

**{¶ 82}** First, we do not know that trial counsel meant to say Juror No. 3. But even if he did, there is no information in the record concerning Juror No. 3's race. *See, e.g., State of Ohio v. Powers*, 1985 WL 11462, *3 (1st Dist. Sept. 4, 1985) (rejecting challenge to composition of jury where the "record contain[ed] no indication of the race of the several jurors, nor of those prospective jurors who were challenged"). Second, we note that the State used a peremptory challenge to strike Juror No. 8, whose race we do not know but who also expressed reservations about relying solely on eyewitness testimony, which lends credibility to the State's professed reason for challenging Juror No. 12. *See e.g., Miller-El v. Dretke,* 545 U.S. 231, 241 (2005) (explaining that evidence of discrimination may exist if the reason for striking Black juror is equally applicable to white juror who is not struck). Third, it is not clear to what extent Juror No. 3 shared the views of Juror Nos. 8 and 12 because there were no follow-up questions. Here, because defense counsel never pointed to Juror No. 3 as someone that Juror No. 12 should be compared against, we have no insight as to why Juror No. 3 was not further questioned. And we would point out again that we have no idea of Juror No. 3's race.

**{¶ 83}** Based on the record before us, we cannot say that the State lacked a legitimate non-racial purpose for using a peremptory challenge to strike Juror No. 12 or

32.

that this rationale was not applied consistently to white jurors. The trial court's decision was not clearly erroneous. We find Garibaldo's second assignment of error not well-taken.

### C. The Mistrial

{¶ 84} As alluded to earlier in this decision, this was the second trial of the charges against Garibaldo. The first trial ended in a mistrial after the State elicited testimony from a witness on a topic that the court had ruled inadmissible, then presented a video that was not properly redacted to omit portions that the court ruled—or the parties agreed—could not be played. In his third assignment of error, Garibaldo argues that the State acted in bad faith when it made these errors, thus double jeopardy should have attached and prevented a retrial. He suggests that the State intended to force a mistrial so that it could present stronger testimony concerning the significance of the Y-STR DNA extracted from S.S.'s ankle.

{¶ 85} The State responds that Garibaldo forfeited any alleged error here because he did not raise an objection in the trial court to being retried. It denies that it committed intentional misconduct or tried to goad defense counsel into seeking a mistrial. The State emphasizes that defense counsel had the opportunity to review the recording before it was played for the jury, but he declined to do so. And it disputes Garibaldo's contention that it intended to force a mistrial so that it could present stronger testimony concerning the significance of the Y-STR DNA. It claims that the testimony at the second trial was not significantly different than it was in the first trial.

33.

## 1. *Improper Testimony*

{¶ 86} Briefly stated, S.S. believed that Garibaldo had killed their new puppy. He took the puppy then texted S.S. photos of a dead dog. S.S. texted people and told them that this had happened and expressed her fear of Garibaldo. The State filed a notice of intent to offer this evidence at trial. Garibaldo opposed the motion and asked that the evidence be excluded. The court ruled that the evidence was unfairly prejudicial and inadmissible.

{¶ 87} On the third day of trial, the State called S.S.'s FBI contact to testify. The State inquired about his communications with S.S. on March 1, 2022. The agent responded: "Well, initially the nature of the conversation on March 1st was she was concerned and she had texted me about her current boyfriend, Juan Garibaldo, possibly having caused harm to a dog that she had just gotten."

{¶ 88} Defense counsel immediately objected and moved for a mistrial. The State's attorney explained that she had sought to elicit only that S.S. was afraid of Garibaldo. She insisted that she had advised the agent that she could not ask him about a dead dog, show him a picture, or show him text messages. She told him that it could be discussed that there was contention over a dog, but they could not discuss killing or harming the dog. She believed that she had made this clear. The State argued against a mistrial and asked that a less severe sanction be imposed. It maintained that the agent had not yet said anything that was beyond the "point of no return."

34.

{¶ 89} The court adjourned for the day and overnight, the parties submitted case law concerning the appropriate sanction for violating the court's order. The next morning, the agent took the stand and was questioned by the court and the parties.

{¶ 90} The trial court questioned the agent about his trial preparation with the State's attorneys. The agent explained that he had been informed that "any mention with regard to the photographs, photograph, rather, that was sent to me of the puppy in a bag were excluded and not to be discussed much, and that testimony regarding the text message could not be inflammatory. . . . There might have been some more details, but that was essentially what was discussed that the photograph was excluded and there wasn't to be any testimony with regard to the photograph." The court asked the agent if he had been instructed about testimony related to the dog or harming or killing the dog. The agent did not recall there being discussion specific to the dog, except "[o]bviously the killing of the dog would have been the discussion about the language in the text message that that wasn't to be discussed in that manner."

{¶ 91} Defense counsel asked the agent if that was all he remembered of the instructions about the dog. The agent said yes but recalled that he had asked the State's attorney—"so I'm to keep my answers related to the text message vanilla?"

{¶ 92} The State's attorney next questioned the agent:

> Q: [M]y goal was to avoid any talking about killing of a puppy or the evidence that you had in regards to the puppy wasn't to be talked about; is that fair?

A: Yes. Yes. And a lot of emphasis on the image that was sent and that it's not to come up.

Q: Or killing of the puppy.

A: Killing of the puppy, correct.

{¶ 93} The parties argued at length concerning whether a mistrial was necessary or whether the introduction of the improper evidence could be remedied short of a mistrial. The State argued as vehemently *against* a mistrial as the defense argued *for* it. Ultimately, the court declined to grant a mistrial. It specifically stated that it believed that the State's attorney informed the witness not to talk about the death of the dog. It observed that the instructions to the witness could have been more detailed, but it did not believe that the State intended to elicit improper testimony with its question. The court found that the statement about the dog was vague, it related only to the possibility of harm to the dog, and it did not concern conduct similar to the crime charged.

{¶ 94} In fashioning a remedy to cure any prejudice resulting from the improper testimony, the trial court sought defense counsel's input. It agreed to instruct the jury to disregard the agent's testimony about the conversation he had with S.S. the day before her murder. The court prohibited the State from further developing the agent's testimony on direct and limited redirect to issues specifically raised on cross-examination. And it ordered the State to have very frank discussions with its witnesses that they could not reference the dog "in any way, shape, or form."

36.

## 2. *Mistakes in Redactions*

{¶ 95} The next misstep occurred four days later. During its direct examination of the lead detective, the State got ready to play a redacted recording of the detectives' interview of Garibaldo. Before doing so, there was a bench conference at which the State's attorney asked defense counsel: "[W]ould you like to review those redactions before I play it? Michelle delivered it up here and I trust that it is done the right way, but that's why I asked to approach." Defense counsel responded: "I'm going to trust that it's done the right way."

{¶ 96} The State played the video and within a couple of minutes, a portion of the recording that was supposed to have been redacted was played. Specifically, detectives called Garibaldo "cold and calculating" and stated that Garibaldo was on parole for the felonious assault of another ex-girlfriend.

{¶ 97} Apparently, there existed two disks of the interview: an original, unredacted disk and a redacted disk. After the redacted disk was created, additional redactions needed to be made. Instead of further redacting the redacted disk, an employee of the State made the second set of redactions to the original, unredacted disk. Thus, the second set of redactions was properly made, but the disk played for the jury did not omit the first set of redactions.

{¶ 98} Again, defense counsel moved for a mistrial. The State opposed the motion, claiming that this error could be cured with an instruction. The State speculated

37.

that the jurors would not focus on this because of the "mountain of evidence" against Garibaldo.

{¶ 99} The trial court articulated its concern that while the "other acts" evidence respecting the dog was not similar to the offense being tried, Garibaldo's felonious assault of a former girlfriend *is* similar. The court adjourned for the evening and allowed the parties to submit case law on whether the error could be cured short of a mistrial.

{¶ 100} The court reconvened the next morning and heard argument from the parties. Defense counsel accused the State of being unprepared, disorganized, and inept. He said that the person who did the redactions was either incompetent or poorly instructed. He was critical because his proposed redactions were submitted on a Friday, but instead of making the redactions over the weekend, the State's attorney waited until Monday at noon, then delegated the task to someone else. Defense counsel argued that the State acted in bad faith or gross malfeasance or intentionally violated the court's order.

{¶ 101} The State's attorney responded that she had not made the redactions over the weekend because the court had not yet ruled on them. She highlighted the fact that defense counsel was asked—but declined—to review the redactions. She denied that she acted in bad faith, but she explained that because she hadn't personally verified that the redactions were made, she was on high alert while the video was playing and stopped it as quickly as she could. The State insisted that a curative instruction could remedy the error, and alluded to case law that it provided the court.

38.

{¶ 102} The court determined that a mistrial was necessary. It pointed out that the State was responsible for the evidence but chose not to verify that the redactions were properly made. But the court emphasized that defense counsel too had declined the opportunity to review the disk before it was played. The court discussed at length the pertinent case law on the topic and distinguished the cases offered by the State. It scolded that the redactions should have been made earlier, but it found that the State did not act with malice or bad faith.

{¶ 103} A new trial was scheduled for three months later. There is no evidence in the record that Garibaldo objected to being retried.

{¶ 104} "The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution ensures that a state may not put a defendant in jeopardy twice for the same offense." *State v. Gunnell,* 2012-Ohio-3236, ¶ 25, citing *Benton v. Maryland,* 395 U.S. 784, 89 (1969). As part of that right, a defendant ordinarily is entitled to have his case decided by the first jury empaneled to try him. *Oregon v. Kennedy,* 456 U.S. 667, 673 (1982).

{¶ 105} But the State is generally permitted to retry a criminal defendant without violating the protection against Double Jeopardy where the first trial was terminated on the defendant's motion for a mistrial. *United States v. Tateo*, 377 U.S. 463, 467 (1964). A narrow exception exists, however, where the defendant's motion for a mistrial "is prompted by prosecutorial misconduct designed to goad the defendant into requesting the mistrial." *State v. Girts*, 121 Ohio App.3d 539, 550-51 (8th Dist. 1997), citing *Kennedy*

39.

at 676 and *State v. Glover*, 35 Ohio St.3d 18 (1988), syllabus. Prosecutorial misconduct alone is not sufficient to trigger the exception to the Double Jeopardy Clause. *City of N. Olmsted v. Himes,* 2004-Ohio-4241, ¶ 37 (8th Dist.). Rather, the State's conduct must have been intentionally calculated to invite a mistrial. *Id.* Courts consider three factors in making this determination.

{¶ 106} To determine whether the State intended to invite or goad the defense into seeking a mistrial, some courts have considered the following factors: "(1) whether a sequence of overreaching existed prior to the single prejudicial incident, (2) whether the prosecutor resisted or was surprised by the defendant's motion for a mistrial, and (3) the findings of the trial court concerning the intent of the prosecutor." *Id.* at ¶ 39; *State v. Kitchen*, 2018-Ohio-5244, ¶ 29 (4th Dist.). Generally speaking, the narrow exception barring a retrial is reserved for situations where the State's misconduct "clearly and unquestionably demonstrates its intent to cause or invite a mistrial." *State v. Kelly*, 2015-Ohio-1948, ¶ 19 (1st Dist.).

{¶ 107} We review de novo the denial of a motion to dismiss on double jeopardy grounds." *Id.* at ¶ 14. Here, Garibaldo did not argue in the trial court that the State was barred on double-jeopardy grounds from retrying him. The State argues that Garibaldo, therefore, has forfeited error here. While the State's position may have merit, *see Risner v. Ohio Dept. of Nat. Resources, Ohio Div. of Wildlife,* 2015-Ohio-3731, ¶ 26, 28 ("[B]y failing to raise the double-jeopardy challenge in the trial court, [defendant] has forfeited

40.

that issue on appeal), we will consider the substance of Garibaldo's claim anyway, primarily because it is easily disposed of.

{¶ 108} First, we acknowledge that there were two prejudicial incidents here—the testimony about S.S.'s concern that Garibaldo had harmed the dog and the error in failing to properly redact the CD. Although there was more than one single prejudicial incident, the State did not exhibit a pattern of overreaching. Essentially it made two mistakes.

{¶ 109} In hindsight, the State should have forcefully advised its witnesses to say *nothing* about the dog. Instead, it focused its instructions on preventing any mention of the photograph of the dead dog and texts concerning the killing of the puppy, leaving the agent with the impression that he was not precluded from making a "vanilla" comment about S.S.'s concern that Garibaldo *harmed* the dog. The trial court did not find this purposeful, and neither do we. Moreover, the State fought hard to dissuade the court from declaring a mistrial, willingly accepting less extreme sanctions.

{¶ 110} As for the improperly-performed redactions, again, the trial court explicitly found no bad faith on the part of the State, despite defense counsel's strong attack of the State's attorneys. To be sure, the State's attorneys acted negligently in failing to review the disk themselves to ensure that it had been properly redacted, but defense counsel also declined to review the disk. And once it realized that an error had been made, the State stopped playing the recording as fast as possible. Again, it fought hard against Garibaldo's motion for a mistrial, providing the court with pertinent case

41.

law, vehemently arguing its position, and suggesting alternative sanctions short of a mistrial.

{¶ 111} In sum, reviewing the pertinent factors, we cannot say that the State's misconduct clearly and unquestionably demonstrated its intent to invite a mistrial. We find Garibaldo's third assignment of error not well-taken.

### III. Conclusion

{¶ 112} Garibaldo's challenge to the sufficiency and weight of the evidence is based on his position that the legal standards should be changed. We are bound by stare decisis to apply the legal standards enunciated by the Ohio Supreme Court and are not free to dictate new evidentiary standards. We find Garibaldo's first assignment of error not well-taken.

{¶ 113} The State asserted a legitimate race-neutral reason for exercising its peremptory challenge to strike Juror No. 12: that juror stated that she would expect DNA evidence as part of "proper procedure" and "proper protocol," even where multiple eyewitnesses are available. Despite Garibaldo's claim that Juror No. 3 expressed similar views, (1) defense counsel made no mention of Juror No. 3, (2) there is no record evidence of Juror No. 3's race, and (3) Juror No. 3 was not questioned at length about this supposed view. Moreover, the State also struck Juror No. 8, who stated that eyewitness accounts are unreliable and he would require forensic evidence, thus the State's rationale was applied consistently. We find Garibaldo's second assignment of error not well-taken.

42.

**{¶ 114}** The State's misconduct did not clearly and unquestionably demonstrate an intent to invite a mistrial. The trial court found no bad faith, and the State did not exhibit a pattern of overreaching—it simply made two mistakes. The State thoroughly argued against a mistrial, suggesting less extreme sanctions to avoid a mistrial. We find Garibaldo's third assignment of error not well-taken.

**{¶ 115}** We affirm the November 1, 2023 judgment of the Lucas County Court of Common Pleas. Garibaldo is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                _____
JUDGE

Christine E. Mayle, J.            

_____

Charles E. Sulek, P.J.            JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.