[Cite as *State v. Knight*, 2025-Ohio-4498.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio                                   Court of Appeals No. S-24-001

    Appellee                              Trial Court No. 22CR0577

v.

Devontae Knight                            **DECISION AND JUDGMENT**

    Appellant                             Decided: September 26, 2025

* * * * *

Anthony J. Richardson, II, attorney for appellant.

Beth A. Tischler, Sandusky County Prosecutor and
Alexis M. Otero, Assistant Prosecuting Attorney, for appellee.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant Devontae Knight appeals the judgment of the Sandusky County

Court of Common Pleas, following a jury trial, convicting him of one count of murder

and sentencing him to an indefinite prison term of 15 years to life. For the reasons that follow, the trial court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} In the early morning hours of March 12, 2022, M.D. was stabbed to death outside of the Pittstop bar in Sandusky County, Ohio.

{¶ 3} The Sandusky County Grand Jury indicted Knight for the murder in violation of R.C. 2903.02(B), an unclassified felony. Knight entered an initial plea of not guilty. He then moved to suppress any statements he made after requesting an attorney during a March 16, 2022 police interview. The trial court held a suppression hearing on the motion at which one of the interviewing officers testified.

{¶ 4} Officer Clayton Holskey testified that on March 16, 2022, he was a detective with the Fremont Police. Knight had been apprehended by the Fostoria Police Department on a warrant from the adult parole authority, and while in their custody he requested to speak with investigators from the Fremont Police. Holskey conducted the interview along with Detective Dustin Nowak.

{¶ 5} A video recording of the interview was played during the suppression hearing. Holskey began the interview by reviewing Knight's *Miranda* rights with him. Knight indicated he understood his rights and voluntarily chose to waive them and speak with the police without an attorney present.

{¶ 6} Knight first stated that he did not know what happened outside the Pittstop bar. He had been with a group of people from a party bus celebrating his girlfriend's

2.

birthday inside the bar when the group he was with rushed outside. Knight followed them outside and saw a scuffle. He then heard gunshots go off and he rushed back to the bus. He did not see anyone get shot.

{¶ 7} On further prompting from Holskey, Knight stated that he heard M.D. had just done a line of cocaine. Holskey explained that M.D. and a person from Knight's group named Ernesto got into a fight in the bar, which caused the bouncer to kick M.D. out. Knight's group was agitated and followed M.D. outside.

{¶ 8} Outside of the bar, M.D. and Ernesto began fighting. Holskey stated that it seemed like M.D. was fighting with everyone and was winning. Knight told Holskey that he did not see that; rather, he saw people swinging at each other, but he did not see anyone get hit. Knight stated that he got involved to try and break up the fight. Specifically, he was trying to break up a "light-skinned dude" and a "tall dude" that had been on the bus with him. Neither the "light-skinned dude" nor the "tall dude" was M.D. Knight explained that as he was trying to break them up, gunshots went off.

{¶ 9} At this point, Holskey changed the direction of the interview and told Knight that M.D. had suffered some stab wounds and there was some DNA foreign to M.D. around the wounds. Holskey asked Knight if he had a knife, which Knight denied. Holskey explained that if M.D. was beating everyone up and someone had to "stick him" once or twice to protect everyone, then that story needs to be told. Holskey asked Knight if he had any cuts on his hands, and Knight said that he had a cut on his right hand from

3.

several days earlier from playing basketball. Knight acknowledged that his hand was bleeding from the cut on the night M.D. was murdered.

{¶ 10} Holskey informed Knight that people told him that Knight stabbed M.D. and that Knight cut his hand when he stabbed him. Knight denied that it happened and denied that he even had a weapon. Nowak interjected and said that a lot of people could be in trouble for what happened to M.D., including Knight's girlfriend. Nowak stated that Knight's girlfriend was looking at potentially the same charges as Knight. Knight responded that he and his girlfriend had nothing to do with it, that it was a simple brawl and they were not involved in the shooting or anything else. Nowak replied that multiple people saw Knight fighting and that he had a knife. Knight denied fighting and denied having a knife or any other weapon.

{¶ 11} Holskey then asked Knight where he went after the fight. Knight responded that they went to some other party, but he did not know where it was since he was not from the area and he was drunk, and then they went home. Holskey said that people from the party heard Knight boasting about stabbing M.D. and saying that he accidentally cut himself when he stabbed M.D. Knight shook his head and denied it.

{¶ 12} Holskey impressed upon Knight that M.D. was dead and that cannot be taken back. He, however, explained that the reason M.D. was stabbed was important. He told Knight that if he stabbed him because he wanted him dead, "that's bad." But, "if you had to stick him to keep him away from you, that's a different story," alluding to self-

4.

defense. Holskey stated that he has never arrested someone for a crime that he did not deserve, and he did not want to do that in this case.

{¶ 13} Holskey and Nowak emphasized that it was a chaotic fight, that M.D. was high on cocaine, and that he was a rough and dangerous person. Holskey also relayed that M.D. has 23 kids who potentially were looking for retribution. Nowak interjected that the point was to get the story of self-defense out early because by the time things go to court it would be too late. Nowak said everyone has a right to protect himself and his friends, and if he was in the situation and it was a melee, he would take drastic measures to help himself and his girlfriend. He said, "so if Devontae Knight is there and he's breaking shit up and he got himself involved in this fight and he has to work a dude a little bit to protect himself and get his girl out of there and get himself out of there, that's the story . . . that needs to be told." Nowak continued to explain that if Knight went there to kill someone, that's different, but that didn't happen. Holskey chimed in that it was not Knight's intention to kill someone. During this exchange, Knight's countenance visibly fell, and he appeared more somber and contemplative.

{¶ 14} Holskey stated that he knew the first stab wound did not stop M.D. M.D. was high on cocaine and kept going and had to be stuck again. Knight then asked how many times M.D. was stabbed, to which Holskey replied, "about eight times." Knight then shook his head in disbelief. Holskey asked, "So you didn't stick him eight times?" and Knight shook his head no. Holskey then asked if it was just once, and at the same time Nowak asked how many times Knight stabbed him. Knight responded that he was

5.

"drunk out of my mind," and what was going on in his head was that he needed to get his girl out of there. Nowak asked, "So how many times do you think you stuck him?" and Holskey asked, "How many times do you think it was?" Knight stammered and shook his head, and then stated, "I need my lawyer, man. Can I get a lawyer?"

{¶ 15} After Knight asked for a lawyer, Holskey responded, "You can have a lawyer. Absolutely." Knight continued to stammer for two seconds, and Holskey said, "That's okay." Holskey sat and looked directly at Knight for another two seconds then said, "That is okay." He continued to sit quietly and look directly at Knight for another four to five seconds. During this time, Knight appeared emotionally upset, looking down, nodding his head, and rubbing his face. After those four to five seconds, Knight said, "I don't know. I didn't plan for none of that to happen. I was just going out with my girl man." Holskey continued to sit quietly, looking intently at Knight for another nine to ten seconds. After those nine to ten seconds of silence, Knight stated he didn't want his girl to get in trouble and that she did not have anything to do with it, in fact, he said no one had anything to do with it and it was just a brawl. After another couple of seconds, Knight said, "I was drunk, man. I'm talking about drunk, drunk." At that point, Holskey reached over and put his hand on Knight's shoulder to comfort him. After another couple of seconds, Knight said something unintelligible but which sounded like "I didn't do anything he died, you know?" Holskey responded, "Do you want to keep talking to me? Do you want me to answer that and ask you some more questions?" Knight replied, "Yeah." Holskey continued, "Cause you asked for a lawyer and that

6.

usually means we have to stop." At the same time, Knight finished Holskey's sentence and said, "you gotta stop," conveying his understanding that because he asked for a lawyer, they must stop the interrogation. Nowak added, "If you want to continue to talk to us and reengage, we can continue to talk." Knight sat silently for three seconds, and as he began to say "Alright, man," Holskey stated, "I know you're not a bad person, and I know you're just a dude like any other dude out there. And this was not what you thought would happen." After further back and forth about how Knight was just there for a birthday party and how M.D. was a bad person who got "jacked up" and violent, Knight stated, "And the thing is, I really thought it was the light-skinned person." Holskey responded, "That's okay, well, you've never seen him. You don't know this man." Nowak added, "You were looking out for you and your girl."

{¶ 16} Holskey then asked, "So, you want to talk to us, is that right? You want to be able to tell your story, right?" Nowak, interjected, "Cause right now it's everybody else's story. We want to hear Devontae's." After five seconds of silence, Holskey added, "We're here for you." Knight responded, "I know what's up."

{¶ 17} After a few seconds of cross-talk, Knight denied that he was bragging and stated that he never wanted the incident to happen at all. He then, however, said that he was the type of person who had to take what he did on the chin like a man. He lamented that he had a life and was getting things together. Knight sat with his head down and shaking for ten seconds before Nowak asked, "How old are you?" Knight replied that he was 31 years old, to which Nowak responded that he has a lot of life left and whatever

7.

mistakes he made can be fixed. As Knight began his retort, Holskey interrupted and said, "Are you deciding to talk with us? . . . Because you're just talking with us. You don't want the lawyer right now. Right? You wouldn't be able to talk with us, okay." Knight responded that he did not want the lawyer right then. Holskey replied, "Well, I'm proud of you for doing that and not letting things you see on TV make you think that cops are bad people. . . . There are bad ones out there who deserve to be in prison, but I am not one and he [Nowak] is not one." Nowak then stated that there are ten stories, and everyone has his own story and his own life, and this is Knight's story and his life. He told Knight that he respected his willingness to be a man and take things on the chin. Holskey added, "You also said that this was not your plan that night." Knight agreed that it was not his plan, but he sometimes gets in a mode where he feels like he must protect people. He continued, "But y'all said he got stabbed eight times. I don't know about that." Holskey responded that maybe some of the wounds were not counted right. Knight then offered, "I only stuck him like twice. And the blade should still be out there." Upon prompting from Holskey, Knight then demonstrated how he stabbed M.D. twice in the side.

{¶ 18} At the suppression hearing, Holskey testified on cross-examination that he has learned that being polite and courteous in the interview is the best way to get information. Further, he learned that being sympathetic to an individual like Knight makes it more likely the suspect will answer questions. Holskey explained that when he put his hand on Knight's shoulder it was because Knight was upset and Holskey wanted

8.

to indicate that he was there for him. He agreed that being sympathetic and affirming to Knight that he was not a bad guy was done to develop a rapport, and if Knight was more comfortable with Holskey, then he would possibly be more relaxed and talk more freely.

{¶ 19} Holskey was then asked why he did not get up and leave when Knight invoked his right to counsel. He replied, "I've learned that, you know, sometimes you have to give it a couple seconds and just see how it goes." The following exchange then occurred,

> Q. So from what I hear you saying then is that you didn't get up because your experience has been if you stay there for a period of time a person may decide then that they don't need an attorney, and that they'll continue talking to you?
>
> A. They may, but I feel like if you just get up, and, you know, you're – you're going to appear that they upset you. You know what I mean?
>
> Q. No. Say that again.
>
> A. So if I -- if he says, you know, I think I -- can I have my attorney, and if I just got up and left the room, he might feel like -- like he offended us.
>
> Q. Or you could have easily just said, look, since you want an attorney, I respect that, and we're going to leave now because you said that?
>
> A. Well, it was only a couple seconds from that thing that he said, and then he just kept talking, so I was going to listen to him.
>
> Q. Okay, all right. And during that time, again that you're -- that he continues to talk and you continue to listen to him, again, is when you're -- you're being sympathetic to him and -- and trying to build that relationship with him so that he'll continue to talk, correct?

9.

A. Well, I wasn't able to ask him any questions of him because he asked for an attorney, but he wanted to continue to talk, so I listened to what he had to say, and at the point when he asked me a question on if it was the stab wounds that -- that killed him, that's when I asked him if he wanted to continue to talk to me 'cause he asked for an attorney.

{¶ 20} Following the hearing, the trial court denied Knight's motion to suppress.

{¶ 21} The matter then proceeded to a four-day jury trial.

{¶ 22} At the trial, Robert Sauseda testified that in the early morning hours of March 12, 2022, he was helping with security at the front door of the Pittstop Bar in Fremont, Sandusky County, Ohio. It was a busy night with approximately 100 people in the bar, and security was using a metal detector to scan everyone for weapons. Anyone who had a weapon was asked to store it in his or her car before being allowed to enter. Sauseda testified that a fight broke out inside the bar, and he helped push M.D., Knight, and about four or five other individuals outside. In addition, about fifteen people followed them outside.

{¶ 23} Once outside, M.D. and several people started fighting on the sidewalk. Others were running to their cars and then running back to the fight. M.D. backed around the corner and up a hill and the fight continued. Sauseda testified that M.D. did not have a weapon because he was scanned before he entered the bar, and he had eyes on him the entire time after he was pushed out of the bar. Sauseda saw some people run around the corner and then he heard gunshots. Upon hearing the gunshots, some people scattered while others continued to fight. Sauseda called 911, and after about two minutes, he went around the corner and up the hill towards M.D. As he arrived, multiple people were

10.

running away from M.D. M.D. was laying on the ground and there was blood visible on his shirt.

{¶ 24} Fremont Police Officer Samantha Lewis responded to the scene on a call of gunshots fired. When she arrived, she found M.D. lying on the ground. He was unresponsive and did not have a pulse. She performed CPR and was able to restore his breathing. Lewis noticed what she believed were multiple stab wounds on M.D.'s left side and one stab wound on his right side between his ribs.

{¶ 25} The manager of Pittstop, Thomas Pitts, authenticated security footage from the early morning of March 12, 2022. He testified that he noticed the fight breaking out inside of the bar and was able to separate M.D. and take him outside. A few seconds later, a Hispanic man exited the bar and got into a fight with M.D. Pitts stated that a couple of other people who had exited the bar joined in the fight but M.D. was holding his own. Pitts saw them move down the street towards the corner a little bit, then he went back inside of the bar. He did not see any of the other parts of the fight.

{¶ 26} Ernesto Gonzales testified that he was with the group on the party bus on March 12, 2022. He was highly intoxicated and had only a vague recollection of that night. He did, however, identify himself on the security video from Pittstop as the individual that got into a physical altercation with M.D. outside of the bar. He testified that some sort of verbal altercation must have happened inside to cause him to act that way.

11.

{¶ 27} Shonquell Denson testified that he was also on the party bus.  He saw Gonzales and M.D. get into a verbal altercation inside the bar and then get pushed outside.  Before M.D. went outside, he snorted a line of cocaine on the bar's pool table.  He and a few other people from the bus then followed them outside.  There, he observed Gonzales and M.D. "tussling and fist fighting."  He tried to break up the fight, but M.D. wanted to continue and began to fight Denson too.  Denson testified that he "squared up" with M.D. and they took a few swings at each other but did not connect.  M.D. was throwing very fast punches and Denson believed that he would probably lose to him.  At that point, Denson vomited from his intoxication and anxiety and abandoned the fight.  He stated that M.D. began fighting a person named Longway, who was also from the party bus.  Again, Longway and M.D. did not seem to be connecting with their blows.  Denson testified that during these fights he never saw M.D. with a weapon.

{¶ 28} Denson then began vomiting again and then heard gunshots.  When he looked up, he saw M.D. and Knight "tussling" on a parked car.  No one else was fighting with M.D. at that point.  He said Knight was swinging "weird."  Instead of throwing straight punches, he was swinging sideways at M.D.'s sides.  Denson then fled towards the bus.  He stated that when he left, M.D. was still standing.

{¶ 29} Knight joined Denson at the bus.  Denson testified that while on the bus, Knight announced that he cut himself.  Denson observed the cut, saw that it was bleeding, and believed it was "fresh."  He also heard Knight say that he "caught a body," which to

12.

Denson meant that he killed someone.  Denson also observed that Knight had a knife on him and was attempting to conceal it.

{¶ 30} Denson admitted that he initially gave the police a false identification when they interviewed people on the bus because he was under supervision and did not want to get in any more trouble, but he later called them and gave his true identity.  The State initially charged Denson for giving a false identity but dropped the charges when he agreed to cooperate with them.  Denson then read for the jury the written statement that he gave to the police, which said, "I, Shonquell Denson, seen Vontae stab someone . . . and I saw his hand full of blood and seen him put a knife in his pocket after everything."

{¶ 31} Kailee James testified that she was also on the party bus and saw M.D. and Gonzales get into a verbal altercation inside the bar.  When they were forced outside, she and others, including Knight, were held inside for a few moments.  Once she got outside, she saw Denson first "square up" with M.D. and then Longway "squared up" with M.D. after him.  She testified that while she saw Denson and Longway throw punches, she did not see any of them hit M.D.  She also remarked that M.D. was not punching back and appeared to just be protecting himself.  According to James, none of the combatants had any weapons on them.  Once she heard the gunshots, she fled to the party bus.

{¶ 32} Kaitlynn Costilla testified that after the altercation she saw Knight pour some tea on his hands on the party bus.

{¶ 33} Doctor Jeffrey Hudson performed the autopsy on M.D.  He discovered nine stab wounds, most of which were superficial.  Two, however, punctured M.D.'s right

13.

lung. The fatal stab wound was on the left side of his body and damaged the heart. Hudson estimated that the wound would have caused death within minutes. He found no gunshot wounds. Hudson also testified that M.D. had cocaine, alcohol, and methamphetamines in his system at the time of death, but that those substances did not kill him.

{¶ 34} Holskey testified that he was the detective who responded to the scene. There, he observed two trails of blood droplets. Holskey testified over objection that the shape of the droplets indicated which direction they were traveling when they hit the road. Holskey stated that the "blood spatters went to some more blood spatters, which led to a trail of blood, which went to a lot more blood." He authenticated photographs documenting his observations.

{¶ 35} Before the continuation of Holskey's testimony the next day, defense counsel moved for a mistrial, arguing that the trial court erroneously allowed Holskey to testify as an expert witness regarding the blood droplets. The trial court denied counsel's motion, finding that Holskey's testimony did not constitute expert testimony.

{¶ 36} Holskey then testified regarding his interview with Knight. Upon prompting from the State, he testified that he began the interview by reviewing the *Miranda* warnings with Knight. Holskey stated that Knight understood the warnings and consented to speak with him. The full recorded interview with Knight was then played for the jury.

14.

{¶ 37} In the interview, in addition to what was recounted above, Knight said that he did not see how many people M.D. "went through" before Knight intervened. He just saw M.D. swinging at "his dude." Knight said that M.D. kept going after he stabbed him twice. Then he heard gunshots and got back to the bus. Knight stated that he dropped the knife in the street and denied that he had it on the bus or that he cleaned it off on his pant leg. He also denied telling someone that he "caught a body." Additionally, Knight strongly denied that he could have killed M.D. and stated that someone else must have also stabbed him. Later in the interview, Knight stated that M.D. had hit him twice in his head and he was drunk and dizzy when he stabbed M.D.

{¶ 38} The State's final witness was Taylor Strohl, Knight's girlfriend at the time of the incident. Strohl did not remember much of the night, but she remembered seeing Gonzales get into an argument with M.D. She, however, did not see an actual physical altercation between the two, just a lot of commotion between a group of people. Strohl testified that she did not make it very far up the street before she heard the gunshots and ran back to the party bus. As she was running, she saw Knight coming from a group of people that were also scattering after the gunshots.

{¶ 39} Following the State's testimony, Knight moved for acquittal pursuant to Crim.R. 29, which the trial court denied. Knight then testified in his own defense.

{¶ 40} Knight testified that he was in the Pittstop celebrating Strohl's birthday when he saw Gonzales get into an argument with a person he did not know, later identified as M.D. Within minutes, people from his group went outside and he followed.

15.

Once outside, he saw a lot of people running up the street towards a "brawl." In addition to the fights with M.D., Knight saw other fights and attempted to intervene in one between a fellow party bus member named "Longway" and a "light skinned guy." He said that he intervened because he did not want there to be any trouble or drama on Strohl's birthday.

{¶ 41} While he was focused on Longway, Knight got "blasted," meaning punched, in the back of his head. He turned around and got "blasted" again. He testified that he felt himself going unconscious and he was afraid and panicked and "did [the] only thing I could do," explaining that he protected himself by swinging the knife. He specified that he swung the knife two times. After that, he dropped the knife and took off running when he heard the gunshots. He testified that he "could have swore" that the person he stabbed took off running too.

{¶ 42} After Knight's testimony, the defense rested without calling any further witnesses. Knight renewed his Crim.R. 29 motion for acquittal, which the trial court again denied.

{¶ 43} The parties then gave their closing arguments, and the trial court instructed the jurors, including on the issue of self-defense. After deliberations, the jury returned with a verdict of guilty on the count of murder in violation of R.C. 2903.02(B).

{¶ 44} The trial court continued the matter for sentencing, at which it imposed a mandatory indefinite sentence of 15 years to life in prison and the costs of prosecution and "any jury fees permitted pursuant to R.C. 2947.23." The trial court also scheduled a

16.

restitution hearing. At the restitution hearing, the State presented bills and invoices for funeral expenses and travel from the victim's family totaling $10,633.69. Knight argued against restitution on the grounds that he was and would be financially unable to pay. On March 25, 2024, the trial court entered its final sentencing entry in which it stated that it "considered the defendant's present and future ability to pay" before ordering Knight to pay restitution of $10,633.69.

## II. Assignments of Error

{¶ 45} Knight timely appeals his judgment of conviction, asserting seven assignments of error for review:

1. The matter should be remanded and reversed because there was no competent credible evidence to support that appellant did not act in self-defense.

2. The trial court committed error by imposing financial sanctions without making the necessary findings.

3. The notice and disclosure required by Crim.R. 12.2 forced appellant to be a witness against himself in violation of his due process and forced him to act to waive other fundamental rights afforded a criminal defendant.

4. The matter should be remanded and reversed because appellant's motion to suppress should have been granted.

5. Appellant did not receive a fair trial where the State elicited testimony about his post-*Miranda* request for an attorney.

6. Appellant did not receive a fair trial where the State elicited unqualified expert testimony.

7. Appellant did not receive a fair trial where the trial court denied instructing, and submitting interrogatory to, the jury on the law of voluntary manslaughter.

17.

## III. Analysis

{¶ 46} For ease of discussion, this court will address Knight's assignments of error out of order, beginning with his third assignment of error.

### A. Constitutionality of Crim.R. 12.2

{¶ 47} In his third assignment of error, Knight argues that Crim.R. 12.2 is unconstitutional. That rule provides,

> Whenever a defendant in a criminal case proposes to offer evidence or argue self-defense, defense of another, or defense of that person's residence, the defendant shall, not less than thirty days before trial in a felony case and fourteen days before trial in a misdemeanor case, give notice in writing of such intent. The notice shall include specific information as to any prior incidents or circumstances upon which defendant intends to offer evidence related to conduct of the alleged victim, and the names and addresses of any witnesses defendant may call at trial to offer testimony related to the defense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant related to the defense, unless the court determines that in the interest of justice such evidence should be admitted.

Specifically, Knight argues that the rule violates (1) his right against self-incrimination as protected by the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution, (2) his right to cross-examine the State's witnesses without providing advance notice of the subject of cross-examination as protected by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution, and (3) his attorney-client privilege and work product as protected by the Sixth Amendment to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

18.

## 1. Right Against Self-Incrimination

{¶ 48} Knight primarily focuses on his contention that Crim.R. 12.2 compels him to incriminate himself and become "the deluded instrument of his own conviction" as stated in *Columbe v. Connecticut*, 367 U.S. 568, 581-582 (1961). Citing *Estelle v. Smith*, 451 U.S. 454, 467-468 (1981), he asserts that requiring him to notify the State of his intent to argue self-defense violates his right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty for such silence." He believes that the Crim.R. 12.2 notice is incriminating, and although the jury was unaware, the notice foreclosed his ability to exercise his right to a fair bench trial, presumably because the trial court would know that his pursuit of an affirmative defense was, in effect, a concession that the elements of the crime were satisfied.

{¶ 49} Knight's novel argument distorts the purpose and effect of Crim.R. 12.2. The rule does not compel Knight to speak or assert self-defense. Rather, it simply provides that if Knight voluntarily chooses to pursue self-defense, he must notify the State of his intention and the evidence on which he is relying. Indeed, Crim.R. 12.2 was promulgated in response to the General Assembly's decision to shift the burden of proof on self-defense from the defendant to the State. *State v. Hawkins*, 2024-Ohio-1253, ¶ 1 (1st Dist.). In this way, the rule comports with the "'philosophy of the Criminal Rules,'" which is "'to remove the element of gamesmanship from a trial.' The purpose of discovery rules is to prevent surprise and the secreting of evidence favorable to one party. The overall purpose is to produce a fair trial." *State v. Palmer*, 2007-Ohio-374, ¶ 18,

19.

quoting *State v. Howard*, 56 Ohio St.2d 328, 333 (1978). Because the State bears the burden of persuasion under R.C. 2901.05(B)(1) to "prove beyond a reasonable doubt that the accused person did not use the force in self-defense," it should generally be given notice that self-defense will be an issue. Furthermore, the disclosure of any evidence supporting the theory of self-defense would by its nature not be incriminating as it provides an affirmative defense to the alleged crime. Knight's argument that Crim.R. 12.2 violates his constitutional right against self-incrimination is therefore without merit.

**2. Right to Confront Witnesses and to Effective Counsel**

{¶ 50} Alternatively, Knight summarily argues that Crim.R. 12.2 violates his constitutional right to confront the witnesses against him because "defense cross-examination, particularly of state witnesses, should not have to be preceded by a defense-created statement that gives advance notice of potential subjects of cross-examination," and that it also violates his constitutional right to effective counsel, the attorney-client privilege, and the attorney work-product doctrine because it compels him to provide specific information where he has no burden to speak at all.

{¶ 51} Knight, however, presents no legal authority or legal reasoning to support his position, and this court is not inclined to conjure up new constitutional rights out of thin air. Moreover, Knight's argument that he should not have to disclose his intention to assert self-defense and the evidence on which he relies is contrary to the purposes of discovery in criminal cases, which is

20.

to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a continuing duty to supplement their disclosures.

Crim.R. 16(A).

{¶ 52} Accordingly, because Knight has not demonstrated that Crim.R. 12.2 is unconstitutional, his third assignment of error is not well-taken.

### B. Motion to Suppress for *Miranda* Violation

{¶ 53} In his fourth assignment of error, Knight argues that the trial court erred when it denied his motion to suppress statements that he made in his interview with Holskey after he invoked his right to counsel.

{¶ 54} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8; *State v. Ruffin*, 2024-Ohio-5626, ¶ 25 (6th Dist.). "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*; *Ruffin* at ¶ 25. "Accepting these facts as true, the appellate court must then independently determine, without deference to the

conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*; *Ruffin* at ¶ 25.

### 1. Knight invoked the right to counsel.

{¶ 55} "In *Miranda v. Arizona*, [384 U.S. 436 (1966)], the United States Supreme Court held that when a defendant requests an attorney, the police must stop interrogation until an attorney is present." *State v. Knuckles*, 65 Ohio St.3d 494, 496 (1992). "For the interrogation to cease, however, the accused must clearly invoke his constitutional right to counsel." *State v. Brown*, 2003-Ohio-5059, ¶ 18, citing *Davis v. United States*, 512 U.S. 452, 459 (1994). "The suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *State v. Tench*, 2018-Ohio-5205, ¶ 76, quoting *Davis* at 459.

{¶ 56} In *Tench*, the Ohio Supreme Court determined that Tench clearly and unambiguously invoked his right to counsel when he asked, "Can I call my cousin?" Notably, Tench's cousin was an attorney. The Ohio Supreme Court held that while "[q]uestions like 'Can I have an attorney?'" are often not treated as clear invocations of the right to counsel, the context of his request indicated that it was "a clear invocation of the right." *Id.* at ¶ 99. In that case, Tench had previously clearly and unambiguously requested an attorney when, upon the detectives entering the interview room, he stated that he needed a number out of his phone "to call [his] attorney." *Id.* at ¶ 90.

22.

{¶ 57} Here, considering the circumstances and the course of the interview, Knight clearly and unambiguously invoked his right to counsel when he stated to Holskey, "I need my lawyer, man. Can I get a lawyer?" After initially speaking with the detectives, his invocation came when the conversation turned to questions of how many times he stabbed M.D. The fact that his response to those questions could be highly incriminating suggests that his request for counsel was not equivocal. Further, Holskey understood that Knight was invoking his right to counsel as made clear by his subsequent attempts to clarify that Knight wanted to keep talking even though he asked for counsel. Thus, like *Tench*, the context of Knight's statements would, and did, lead a reasonable police officer to understand his statements to be a request for an attorney.

{¶ 58} Once Knight invoked his right to counsel, Holskey was required to stop his interrogation. "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981). Put another way, "if the suspect does request counsel, police may still interrogate him if—but only if—he initiates a conversation." *Tench* at ¶ 76. "[T]he 'initiation' must come prior to the further interrogation; initiation only becomes an issue if the agents follow *Edwards* and cease interrogation upon a request for counsel." *U.S. v. Gomez*, 927 F.2d 1530, 1538-1539 (11th Cir. 1991); *State v. Brooks*, 1995 WL 390935, *3 (10th Dist. June 27, 1995).

23.

**{¶ 59}** Here, Knight's incriminating statements occurred after he invoked his right to counsel. This raises two questions. The first is whether Holskey's actions in sitting quietly and staring intently at Knight, and placing his hand on Knight's shoulder, constituted interrogation. The second is whether Knight subsequently waived his right to counsel again when he continued speaking with the detectives.

## 2. Holskey stopped the interrogation.

**{¶ 60}** As to the first question, interrogation refers to "either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980). It has been defined as including "'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Knuckles*, 65 Ohio St.3d at 496, quoting *Innis* at 301. "It is not necessary to phrase the communication in the form of a question to constitute an interrogation." *Id.*

> A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

(Emphasis sic.) *Innis* at 301. "The fundamental import of the privilege [against compulsory self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." (Emphasis deleted.) *Id.* at 300, quoting *Miranda*, 384 U.S. at 478.

24.

"'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* "Thus, to determine whether a suspect has been 'interrogated,' the heart of the inquiry focuses on police coercion, and whether the suspect has been compelled to speak by that coercion." *State v. Tucker*, 81 Ohio St.3d 431, 436 (1998).

{¶ 61} In *Innis*, the United States Supreme Court held that no interrogation occurred where police officers had a conversation in front of the defendant, which he interrupted and then made incriminating statements about the location of a gun. In that case, police received a report about an armed robbery by a man with a sawed-off shotgun. *Innis* at 293. Police apprehended the defendant, but no gun was found. Once in custody, the defendant invoked his right to counsel. *Id.* at 294. The police then transported the defendant to the police station in a patrol wagon. During the trip, and with the defendant in the backseat, the officers openly had a conversation about how there was a school for handicapped children nearby and how it would be too bad if a little girl found the gun, picked it up, and maybe killed herself. *Id.* at 295. The defendant interrupted the conversation and directed the police to the location of the gun because he "wanted to get the gun out of the way because of the kids in the area in the school." *Id.* The United States Supreme Court held that the defendant was not subjected to express questioning, nor was he subject to the "functional equivalent" of questioning. *Id.* at 302. It reasoned that the record did not suggest the officers were aware that the defendant "was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped

25.

children," or that they knew the defendant "was unusually disoriented or upset at the time of his arrest." *Id.* at 302-303. "Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, [the court could] not say that the officers should have known that it was reasonably likely that Innis would [make a self-incriminating response]." *Id.* at 303.

{¶ 62} In *Knuckles*, 65 Ohio St.3d at 497, the Ohio Supreme Court distinguished *Innis*, and determined that Knuckles's confession was the result of an "interrogation." There, Knuckles was arrested on an outstanding warrant for writing bad checks, which the police admitted was a pretext for bringing him in to question him as a suspect in the murder of Bobby Bennett. *Id.* at 494. He immediately invoked his right to counsel. *Id.* Instead of ending the questioning, however, the officers said, "We want to talk to you about Bobby Bennett." *Id.* The Ohio Supreme Court held that this constituted an "interrogation" for three reasons. First, the police only arrested Knuckles to talk to him about the murder, thus their statement was more than the "offhand remarks" made in *Innis*. Second, the statement was interrogatory in nature because it invited a response. Third, the statement violated the "rigid bright-line rule" from *Edwards* that "[o]nce an accused invokes his right to counsel, all further custodial interrogation must cease and may not be resumed in the absence of counsel unless the accused thereafter effects a valid waiver of his right to counsel or himself renews communication with the police." *Id.* at 497, quoting *State v. Williams*, 6 Ohio St.3d 281 (1983), paragraph four of the syllabus. The court reasoned that "[t]he bright-line rule established in these cases eliminates the

26.

need for *ad hoc* determinations by the courts regarding what communications with a defendant are permissible once counsel is requested. It removes uncertainty by stopping all interrogation. It clearly tells the police what cannot be done." *Id.*

{¶ 63} In contrast, in *State v. Tucker*, 81 Ohio St.3d 431 (1998), the Ohio Supreme Court held that Tucker's confession to corrections officers was not the result of an "interrogation." In that case, Tucker was being held in jail awaiting trial on charges of aggravated murder. He had been watching television news coverage of his co-defendant's separate trial when guards noticed that he was "nervous and 'wasn't himself.'" *Tucker* at 434. The guards moved him to a different room and gave him a cigarette and soft drink to help him calm down. Knowing that he had received some mental health counseling while being detained, the guards asked Tucker if he wanted a mental health professional to come to the jail. Tucker rejected the offer. *Id.* at 434. Tucker then began talking to the guards about his co-defendant's trial, "telling them he wished 'this would just get over' so he could 'start [his] time.'" *Id.* at 435. He told the guards he was going to plead guilty when he was tried—unless his co-defendant got the death penalty. *Id.* "At this point, one of the guards remarked, 'when this is all said and done, I'd like to hear about what happened that day.' Tucker stated that he would tell them 'right now' what happened 'if it doesn't go any further.' One of the guards said, 'you don't have to talk about it.' Tucker said it helped him to talk about it and proceed to tell the guards [about the offense]." *Id.*

27.

{¶ 64} Reviewing the matter, the Ohio Supreme Court determined that the officers' conduct was not the functional equivalent of an interrogation because "the officers reasonably should not have anticipated that their actions or words would be likely to evoke an incriminating response." *Id.* at 437. The court noted that Tucker voluntarily turned the conversation to the subject of the murder, and any further interaction between them "was a continuation of the conversation and flowed from the initial volunteered incriminating statement of Tucker." *Id.* Further, the Ohio Supreme Court held that the officers' interaction with Tucker had "all the earmarks of casual conversation," and the one officer's "offhand remark" that "when this is all said and done, I'd like to hear about what happened that day," was not "reasonably likely to elicit an incriminating response." *Id.* at 437-438.

{¶ 65} In a fact pattern more similar to the present case, the Fifth Circuit affirmed the district court's denial of a motion to suppress a confession in *U.S. v. Dougall*, 919 F.2d 932 (5th Cir. 1990). In that case, after the defendant requested an attorney and fell silent, "the officers sat in the room in silence for a short time [and the defendant] resumed talking and confessed." *Dougall* at 934. The Fifth Circuit reasoned that the officers' tactics did not amount to improper interrogation because the "minor momentary inaction" was not coercive and did not place improper psychological pressure upon the defendant. *Id.* at 936.

{¶ 66} In this case, Holskey's conduct in remaining silent and staring at Knight, and placing his hand on Knight's shoulder as a sign of comfort, was not express

28.

questioning.  It also was not the functional equivalent of express questioning.  Like *Dougall*, Holskey's act of remaining quiet and looking at Knight for a few seconds, although effective for giving him the opportunity to speak, was not itself coercive such that it was "reasonably likely to elicit an incriminating response."  Likewise, it cannot be said that Holskey reasonably should have known that his act of placing his hand on Knight's shoulder would coerce Knight into providing an incriminating response.

{¶ 67} The record demonstrates, therefore, that Holskey and Nowak stopped interrogating Knight immediately after he invoked his right to counsel.

### 3. Knight reinitiated the conversation and waived his right to counsel.

{¶ 68} The next question that must be answered is whether Knight initiated further conversation about the crime and subsequently waived again his right to counsel.

{¶ 69} After Knight invoked his right to counsel, Holskey remained silent for a few seconds until Knight initiated further discussion about the crime.  Specifically, Knight stated that he "didn't plan for none of that to happen," and he did not want his girlfriend to get in trouble because she did not have anything to do with it.  He further stated that no one had anything to do with it, and it was just a brawl.  Knight then asked Holskey a question about whether the stab wounds killed M.D., saying "I didn't do anything he died, you know?"  Importantly, Knight's comments and question directly concerned the crime, it was not about the "routine incidents of the custodial relationship," which the Ohio Supreme Court has recognized does not "'initiate' a conversation in the sense in which that word was used in *Edwards*."  *Tench*, 2018-Ohio-5205, at ¶ 104,

29.

quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983). Although there was only a delay of a few seconds, Knight was the one who reinitiated the conversation after the interrogation stopped because he invoked his right to counsel.

{¶ 70} This leads to the final part of the inquiry, which is whether Knight re-waived his right to counsel. "[E]ven if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Bradshaw* at 1044.

{¶ 71} For the waiver to be valid, it must be "knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police reopened the dialogue with the authorities." *Tench* at ¶ 107, quoting *Edwards*, 451 U.S. at 486, fn. 9; *U.S. v. Jackson*, 70 F.4th 1005, 1009 (7th Cir. 2023). "It is well established that waivers of *Miranda* rights—including the right to the presence of a lawyer during custodial interrogation—need not be expressly made to be valid." *Id.* at ¶ 108, citing *North Carolina v. Butler*, 441 U.S. 369, 374-376 (1979); *State v. Martin*, 2017-Ohio-7556, ¶ 101. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.*, quoting *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010).

30.

{¶ 72} In *Tench*, the Ohio Supreme Court held that the State carried its burden to show that the defendant waived his rights when, after invoking his right to counsel and without prompting, he began to talk about the victim's death. *Id.* at ¶ 105, 109. The court reasoned that the defendant had been properly advised of his rights, the police did not make any threats or offer any promises or inducements to talk to them without counsel, and he initiated the conversation about the case. *Id.* at ¶ 109.

{¶ 73} Here, the evidence is even stronger that Knight waived his right to counsel. Like in *Tench*, Knight had been properly advised of his rights, Holskey and Nowak did not make any threats or offer any promises to talk without counsel, and Knight reinitiated the conversation about M.D.'s death. Indeed, Knight continued talking about the crime unprompted almost immediately after he invoked his right to counsel, and when Holskey asked Knight if he wanted to continue talking, Knight replied, "Yeah." Knight then finished Holskey's sentence indicating his understanding that because he requested counsel, the officers "gotta stop" the interrogation. After Nowak added, "If you want to continue to talk to us and reengage, we can continue to talk," Knight sat quietly for three seconds before saying "Alright, man." This exchange when viewed in the totality of the circumstances demonstrates that Knight knowingly and intelligently waived his right to counsel before continuing to speak with Holskey about the crime, and because he did not re-invoke his right to counsel at any time afterwards, any statements he made during the rest of the interrogation were not in violation of *Miranda*.

**{¶ 74}** Importantly, Holskey's subsequent attempts to clarify that Knight wanted to keep talking does not impact the analysis. It is immaterial whether Holskey subjectively believed that Knight had re-waived his right to counsel. Instead, whether an accused has "invoked his right to counsel" is "an objective inquiry." *State v. Logsdon*, 2025-Ohio-298, ¶ 26 (2d Dist.), quoting *Davis v. United States*, 512 U.S. 452, 458-459 (1994); *State v. Cepec*, 2016-Ohio-8076, ¶ 37.

Furthermore, because Knight objectively re-waived his right to counsel when he replied "Yeah," and "Alright man," the ensuing comments by Holskey and Nowak were not *impermissible* interrogation even though they were intended to coerce Knight into making incriminating statements. At that point, Holskey was free to use the interrogation tactics of wanting Knight to believe that he thought Knight was not a bad person but was a regular "dude" that just wanted to enjoy his girlfriend's birthday, emphasizing that M.D. was a bad person who got "jacked up" on cocaine, expressing sympathy and understanding that Knight did not know M.D. and "was just looking out for you and your girl," and entreating Knight to tell his "story."

**{¶ 75}** In sum, Knight validly invoked his right to counsel, and Holskey stopped the interrogation. Knight, however, subsequently reinitiated the conversation with Holskey and waived the right he just asserted. Accordingly, his confession was not in violation of *Miranda*, and the trial court did not err when it denied his motion to suppress. Knight's fourth assignment of error is not well-taken.

### C. Testimony on Invocation of Right to Counsel

32.

{¶ 76} In his fifth assignment of error, Knight argues that the trial court erred when it permitted Holskey to testify about the circumstances of his invocation of the right to counsel.

{¶ 77} As the State was playing the video of Holskey's interview with Knight during his direct examination, it paused sometime after Knight invoked his right to counsel. The following occurred:

> Q      All right, Officer, at one point he asked you for an attorney?
>
> A      Yes.
>
> Q      Why is that significant?
>
> A      Well, he was advised of his rights earlier, and, like I said, he had the right to stop talking to us, so he asked for his attorney, which means that we're not allowed to continue questioning; ah, he continued to attempt to talk to us, and it appeared that he wanted to keep talking, and so he was asked, you know, do you want to continue to talk to us without the lawyer present, which means if he says, yes, he does, then he continues.
>
> Q      All right. So during this portion of the -- of the interview, he continues to talk, but you're not permitted to ask questions; is that fair?
>
> A      Right.
>
> Q      All right. Unless he re-engages?
>
> A      Right.
>
> Q      All right. And is that what we've recently heard him do during this conversation?
>
> A      Yes, it is.
>
> Q      All right.

33.

{¶ 78} Notably, Knight did not object to Holskey's testimony and has therefore waived all but plain error. *State v. Neal*, 2025-Ohio-312, ¶ 31 (6th Dist.) ("The failure to object to trial testimony or specify the basis for an objection waives all but plain error."). To demonstrate plain error, Knight must show "that an error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial." *State v. Echols*, 2024-Ohio-5088, ¶ 50, citing *State v. Knuff*, 2024-Ohio-902, ¶ 117; Crim.R. 52(B). "Plain error should be noticed only 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, quoting *State v. Clayton*, 62 Ohio St.2d 45, 47 (1980).

{¶ 79} "Clearly, it is improper for evidence to be admitted that a defendant invoked his or her right to counsel." *State v. Jones*, 90 Ohio St.3d 403, 414 (2000). Nevertheless, "the defendant's *conviction* may be affirmed, provided that the comments regarding the defendant's silence are found to be harmless beyond a reasonable doubt." (Emphasis sic.) *State v. Thompson*, 33 Ohio St.3d 1, 4 (1987).

{¶ 80} Here, Holskey's testimony was harmless beyond a reasonable doubt because it did not produce the prejudice commonly associated with testimony about the invocation of counsel. "Comments by prosecutors on the post-arrest silence or refusal to testify by defendants have always been looked upon with extreme disfavor because they raise an inference of guilt from a defendant's decision to remain silent." *Id*. In this case, however, Knight kept talking. The jury, therefore, could not have inferred guilt from his

34.

silence because he was not silent. Holskey's testimony merely explained to the jury why he did not continue to ask questions until Knight affirmed that he wanted to reengage.

{¶ 81} Accordingly, because Knight suffered no prejudice from Holskey's testimony about his invocation of the right to counsel, his fifth assignment of error is not well-taken.

### D. Prosecutorial Misconduct in Eliciting Testimony

{¶ 82} Knight next argues in his sixth assignment of error that the State committed prosecutorial misconduct when it elicited allegedly expert testimony from Holskey regarding blood spatters and knife wounds.

{¶ 83} "'The two-fold test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and whether it prejudicially affected the substantial rights of the defendant.'" *State v. Owens*, 2025-Ohio-2035, ¶ 133 (6th Dist.), quoting *State v. Carswell*, 2023-Ohio-4574, ¶ 42 (6th Dist.). "'Important considerations are whether the misconduct was an isolated incident or a protracted series of improper arguments, whether the defendant objected, whether curative instructions were given, and whether the evidence of guilt was overwhelming.'" *Id.*, quoting *State v. Norales-Martinez*, 2018-Ohio-4356, ¶ 32 (6th Dist.). "A reversal for prosecutorial misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct." *Norales-Martinez* at ¶ 32, quoting *State v. Boles*, 2010-Ohio-5503, ¶ 50 (6th Dist.).

{¶ 84} During his direct examination, Holskey testified regarding blood droplets and trails of blood that he observed at the scene.  Defense counsel initially objected to Holskey's ability to make investigative determinations from the pattern of the blood based on his training and experience, which the trial court overruled.  Holskey testified that "these blood spatters went to some more blood splatters, which led to a trail of blood, which went to a lot more blood."  Knowing where M.D. was found, he concluded that the trail of blood was heading towards M.D.'s body.  He further offered, "And we should also note that the amount of blood seen in [marker] A was a couple spatters, the next marker was a couple spatters, and now we're having more blood.  So that would tell me that wounds are bleeding more."

{¶ 85} Knight argues on appeal that the State wrongfully attempted to "bolster a lay witness's credibility by eliciting what was essentially expert testimony where the witness was not qualified as such an expert."  Notably, defense counsel made a similar argument in the trial court when moving for a mistrial.

{¶ 86} In this case, Holskey was not offering an expert opinion.

> To testify as an expert, a witness must meet three criteria:  (1) [his] testimony 'either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons'; (2) the person is qualified to be an expert based on [his] 'specialized knowledge, skill, experience, training, or education regarding the subject mater of the testimony'; and (3) [his] testimony is 'based on reliable scientific, technical, or other specialized information.'

*State v. Kamer*, 2022-Ohio-2070, ¶ 114 (6th Dist.), quoting Evid.R. 702(A)-(C).  "The distinction between lay and expert-witness opinion testimony is that lay testimony results

36.

from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning that only specialists in the field can master." *Id.*, quoting *State v. Lavender*, 2019-Ohio-5352, ¶ 95 (1st Dist.). As the trial court found, specialized knowledge is not needed to understand the direction of a trail of blood where it progresses from small amounts of blood to larger amounts of blood to a pool of blood by the victim's body.

{¶ 87} Furthermore, this testimony did not prejudice Knight. The path of the fight was not disputed and was described by numerous witnesses and depicted by the security camera video. Additionally, M.D.'s path after he was stabbed is largely inconsequential as it has no relevance to whether Knight stabbed him. The State, therefore, did not commit prosecutorial misconduct when it elicited testimony from Holskey regarding the direction of the blood trail.

{¶ 88} Knight alternatively argues that the State committed prosecutorial misconduct when it elicited expert testimony from Holskey that M.D. "definitely" died from a stab wound. Holskey offered this opinion while testifying about his interview with Knight, and he was explaining that during the interview he had the autopsy report that concluded that M.D. died from a stab wound, not a gunshot. Holskey, therefore, was not offering an expert opinion, but rather was relaying his understanding of the cause of M.D.'s death based upon the results of the autopsy. Furthermore, this testimony did not prejudice Knight since the coroner also testified at trial that M.D. definitively died from a

37.

knife wound that damaged his heart. The State, therefore, did not commit prosecutorial misconduct when it elicited testimony from Holskey that Knight died from a stab wound.

{¶ 89} Accordingly, Knight's sixth assignment of error is not well-taken.

### E. Denial of Jury Instruction on Voluntary Manslaughter

{¶ 90} In his seventh assignment of error, Knight argues that the trial court erred when it denied his request to instruct the jury on the law of voluntary manslaughter. He contends that the trial court should have permitted him to present the alternative theories of self-defense and voluntary manslaughter to the jury.

{¶ 91} Knight's argument is not consistent with the trial court's decision. As Knight notes, the trial court initially asked him to choose between voluntary manslaughter and self-defense instructions "because what the Court heard from the testimony did not rise to a level of being able to alternatively send this to the jury." After further consideration, however, the trial court informed Knight that it was denying his request for a jury instruction on voluntary manslaughter. Knight argues that the trial court denied giving the voluntary manslaughter jury instruction because it was inconsistent with the self-defense jury instruction. The transcript reveals, however, that the trial court denied the instruction because there was no evidence to support it. In any event, the trial court's failure to give the voluntary manslaughter jury instruction was not error because it was not warranted under the facts of this case. *See State v. Lozier*, 2004-Ohio-732, ¶ 46 ("A reviewing court is not authorized to reverse a correct judgment merely because it was reached for the wrong reason.").

38.

**{¶ 92}** "[R]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Knuff*, 2024-Ohio-902, ¶ 182, quoting *State v. Adams*, 2015-Ohio-3954, ¶ 240. A trial court's refusal to give a requested jury instruction is reviewed for an abuse of discretion. *Id.* An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶ 93}** "[A] judge is to give instructions on lesser-included and inferior-degree offenses only when the evidence would allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser-included or inferior-degree offenses." *Knuff* at ¶ 183, quoting *State v. Lloyd*, 2022-Ohio-4259, ¶ 26. In this case, Knight argues the jury should have been instructed on the inferior offense of voluntary manslaughter, which states that "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another . . . ." R.C. 2903.03(A).

**{¶ 94}** "Whether a voluntary-manslaughter instruction should be given requires consideration of both an objective and a subjective factor." *Knuff* at ¶ 184, citing *State v. Thompson*, 2014-Ohio-4751, ¶ 153. "The objective factor requires determining whether a serious provocation occurred and whether that provocation was 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" *Id.*, quoting

39.

*State v. Shane*, 63 Ohio St.3d 630, 635 (1992). "[T]he subjective factor requires evaluating whether 'this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage.'" *Id.*, quoting *Shane* at 634.

{¶ 95} Here, the only evidence that M.D. provoked Knight was Knight's testimony that M.D. "blasted" him on the back of the head; Knight did not previously know M.D., was not involved in M.D.'s verbal altercation with Gonzales inside the Pittstop, and was not part of the initial fight with M.D. outside of the bar. Even assuming that being "blasted" on the back of the head was objectively sufficient provocation, however, no evidence exists that Knight subjectively was under the influence of sudden passion or in a sudden fit of rage. Indeed, at no time during his interview with Holskey or his testimony on the witness stand did Knight suggest that he was enraged or inflamed with passion when he stabbed M.D. Instead, Knight testified that he was afraid, that he felt himself losing consciousness, and that he reacted to protect himself. Thus, because the record contains no evidence that Knight acted under a sudden influence of passion or in a sudden fit of rage, a reasonable juror could not have found that Knight committed voluntary manslaughter, and the trial court did not abuse its discretion when it denied Knight's request for the instruction.

{¶ 96} Accordingly, Knight's seventh assignment of error is not well-taken.

**F. Manifest Weight Review of Jury's Finding Against Self-Defense**

40.

**{¶ 97}** In his first assignment of error, Knight argues that there is no competent, credible evidence to support the finding that he did not act in self-defense beyond a reasonable doubt.

**{¶ 98}** The Ohio Supreme Court has directed that "[t]he [S]tate's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal." *State v. Messenger*, 2022-Ohio-4562, ¶ 27. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Walker*, 2024-Ohio-5531, ¶ 69 (6th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶ 99}** "The elements of self-defense differ depending upon whether the defendant used deadly or non-deadly force." *Walker* at ¶ 71, quoting *State v. Tuggle*, 2023-Ohio-3965, ¶ 47 (6th Dist.). "A person may use deadly force in self-defense where he (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that

he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger." *Id.*, quoting *State v. Lathan*, 2024-Ohio-2514, ¶ 77 (6th Dist.); *Messenger* at ¶ 14. The State overcomes the defendant's claim of self-defense if it disproves any one of the elements beyond a reasonable doubt. *Id.* at ¶ 70; *State v. Carter*, 2024-Ohio-5031, ¶ 47 (6th Dist.). The dispute in this case largely centers on the first two elements.

{¶ 100} As to the first element, Knight argues that the evidence shows he was not at fault in creating the brawl, which started with a confrontation between M.D. and Gonzales, and he only entered to try and break up the fight.

{¶ 101} The State, on the other hand, argues that Knight was at fault in creating the situation. It points to the testimony that M.D. was involved in a series of confrontations, first with Gonzales, then with Denson, and then with "Longway." None of those individuals were seriously injured in the fights, and most of the witnesses did not see any punches being landed. In addition, no one saw any of those combatants with a weapon. The State contends that when the altercations first began outside, Knight was still inside the Pittstop, and he could have simply not gotten involved. Instead, the video shows Knight exit the Pittstop and run down the street towards the fight, thereby voluntarily entering the affray.

{¶ 102} The concept of not being at fault in creating the situation that gave rise to the affray "is broader than simply not being the immediate aggressor. A person may not

42.

provoke an assault or voluntarily enter an encounter and then claim a right of self-defense." *State v. McClain*, 2025-Ohio-577, ¶ 25 (6th Dist.), quoting *State v. Elam*, 2022-Ohio-1895, ¶ 14 (12th Dist.); *State v. Mitchell*, 2023-Ohio-3543, ¶ 37 (6th Dist.) ("[I]t is well established that a person cannot provoke a fight or voluntarily enter combat and then claim self-defense."). Reviewing the record as a thirteenth juror, the evidence in this case demonstrates that Knight voluntarily interjected himself into a fight between people with whom he was barely connected and who did not need defending. He therefore was at fault in creating the situation that led to the stabbing.

{¶ 103} Alternatively, the record also supports the conclusion that Knight did not have a bona fide belief that he was in danger of imminent death or great bodily harm and that his only means of escape was to use deadly force. This element is a combined subjective and objective test: "An individual's belief that he or she was in imminent danger must be objectively reasonable, and the individual must have an honest subjective belief to that effect." *Walker*, 2024-Ohio-5531, at ¶ 73, quoting *State v. Alexander*, 2023-Ohio-3450, ¶ 19 (9th Dist.). "A bona fide belief requires weighing the use of force against the believed danger, permitting 'only such force as is necessary to repel an attack.'" *Id.*, quoting *State v. Woods*, 2023-Ohio-3549, ¶ 54 (6th Dist.), quoting *State v. Lane*, 2023-Ohio-1305, ¶ 24 (6th Dist.).

{¶ 104} Outside of Knight, the witnesses in this case testified that the "brawl" ended up being a bunch of drunk people swinging fists at each other but not connecting. No one testified to any injuries. Denson and James testified that they did not see M.D. hit

43.

anyone. Gonzales, while having little memory of the night, testified that he was not injured and did not wake up the next morning injured. The witnesses consistently testified that no one had a weapon. Simply put, the evidence does not establish that the fight created an imminent danger of death or great bodily harm that would justify using deadly force.

{¶ 105} Knight, arguing otherwise, relies on his testimony that while he was attempting to be the peacemaker, he got "blasted" in the back of his head, turned around, and got "blasted" again, and as he felt himself losing consciousness, he became scared and stressed, and responded by swinging his knife in an effort to protect himself. The jury, however, in finding Knight guilty implicitly did not believe his testimony.

{¶ 106} Although manifest-weight review requires this court to consider the credibility of witnesses, the review "must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Garibaldo*, 2025-Ohio-1093, ¶ 71 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *Id.*, quoting *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.).

{¶ 107} Here, Knight's credibility is undermined by his late revelation that he was "blasted" in the head before he stabbed M.D. Knight did not offer it when police

44.

questioned the group on the party bus immediately after the incident. In his interview with Holskey, Knight first denied any involvement in the incident at all and denied even having a knife. When he then admitted to stabbing M.D., it was to protect his girlfriend and another individual from the party bus. Only later in the interview did Knight disclose that he was being punched in the head and was losing consciousness. Furthermore, Knight testified that he only stabbed M.D. twice in self-defense, but the coroner testified that M.D. suffered nine stab wounds. The jury, therefore, had good reason to disbelieve Knight's self-serving testimony that he was hit in the head and was losing consciousness before swinging the knife in self-defense.

{¶ 108} Having weighed the evidence and all reasonable inferences and having considered the credibility of the witnesses, the jury did not clearly lose its way or create a manifest miscarriage of justice when it found that the State proved that Knight did not act in self-defense beyond a reasonable doubt. Accordingly, Knight's conviction for murder is not against the manifest weight of the evidence, and his first assignment of error is not well-taken.

## G. Financial Sanctions

{¶ 109} Finally, in his second assignment of error, Knight argues that the trial court erred when it determined that he would have the means to pay the financial sanctions it imposed, including restitution.

{¶ 110} Felony sentences are reviewed pursuant to R.C. 2953.08(G)(2), which provides, in pertinent part,

45.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

. . .

(b) That the sentence is otherwise contrary to law.

{¶ 111} Here, the trial court ordered Knight to pay $10,633.69 in restitution pursuant to R.C. 2929.18(A)(1), and ordered him to pay "the costs of prosecution and any jury fees permitted pursuant to R.C. 2947.23." Knight contests that there is nothing in the record to support his ability to pay those financial sanctions.

{¶ 112} The State first responds that the trial court was not required to consider his ability to pay the mandatory costs of prosecution under R.C. 2947.23. Indeed, R.C. 2947.23(A)(1)(a) provides that "[i]n all criminal cases, . . . the judge or magistrate shall include in the sentence the costs of prosecution, . . . and render a judgment against the defendant for such costs." Further, "[i]f a jury has been sworn at the trial of a case, the fees of the jurors shall be included in the costs, which shall be paid to the public treasury from which the jurors were paid." R.C. 2947.23(A)(2)(a). "Under R.C. 2947.23(A)(1)(a), the imposition of prosecution costs are mandatory, and the trial court is required to impose these without consideration of whether the defendant has the ability to pay such costs." *State v. Watkins*, 2025-Ohio-1717, ¶ 29 (6th Dist.), quoting *State v. Townsend*, 2023-Ohio-2625, ¶ 10 (6th Dist.). The trial court's imposition of the costs of

46.

prosecution under R.C. 2947.23 regardless of Knight's ability to pay, therefore, is not contrary to law.

{¶ 113} As to the order of restitution, the State argues that the trial court did consider Knight's ability to pay. In addition, the State contends that Marsy's Law as set forth in Article I, Section 10a(A)(7) of the Ohio Constitution, entitles the victim to "full and timely restitution from the person who committed the criminal offense or delinquent act against the victim," which cannot be reduced by an offender's inability to pay. Because the record demonstrates that the trial court considered Knight's present and future ability to pay, this court will not reach the State's constitutional argument. *See In re D.S.*, 2017-Ohio-8289, ¶ 7 ("It is well settled that this court will not reach constitutional issues unless absolutely necessary.").

{¶ 114} "A court is generally required to consider a defendant's present and future ability to pay before imposing a financial sanction permitted by R.C. 2929.18, including restitution." (Internal quotation omitted). *State v. Eames*, 2024-Ohio-183, ¶ 20 (6th Dist.). Specifically, R.C. 2929.19(B)(5) provides that "[b]efore imposing a financial sanction under section 2929.18 of the Revised Code . . ., the court shall consider the offender's present and future ability to pay the amount of the sanction or fine."

> However, "[a] hearing on a defendant's ability to pay is not required. Nor is a court required to make findings. All that is required is that the trial court consider a defendant's ability to pay . . .. [A] trial court is not required to expressly state that it considered [a defendant's] ability to pay a fine . . .. [A] reviewing court may infer that a trial court considered the issue." *State v. Johnson*, [2021-Ohio-3380, ¶ 28 (6th Dist.)], quoting *State v. Davenport*, [2017-Ohio-688, ¶ 31 (2d Dist.)]; *State v. Lieb*, [2023-Ohio-

47.

574, ¶ 9-11 (6th Dist.)]. "And, although preferred on appellate review, a trial court need not explicitly state in its judgment entry that it considered a defendant's ability to pay a financial sanction." *Lieb* at ¶ 10, citing *State v. Dahms*, [2012-Ohio-3181, ¶ 29 (6th Dist.)]. "An appellate court will look to the totality of the record to determine whether the requirement has been satisfied." *Id.* at ¶ 11.

*State v. Saxer*, 2023-Ohio-3548, ¶ 14 (6th Dist.).

{¶ 115} In this case, the trial court expressly found in its sentencing entry that it considered Knight's ability to pay. Further, during the restitution hearing, defense counsel made a detailed argument concerning Knight's ability to pay the financial sanctions now and in the future. Because, therefore, the record confirms that the trial court satisfied R.C. 2929.19(B)(5) when imposing the financial sanction of restitution, Knight's sentence is not contrary to law.

{¶ 116} Accordingly, his second assignment of error is not well-taken.

### IV. Conclusion

{¶ 117} For the foregoing reasons, the judgment of the Sandusky County Court of Common Pleas is affirmed. Knight is ordered to pay the costs of this appeal pursuant to App.R. 24.

JUDGMENT AFFIRMED.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

JUDGE

Charles E. Sulek, P.J.
CONCUR.

JUDGE

Christine E. Mayle, J.
DISSENTS AND WRITES
SEPERATELY.

**MAYLE, J.**

{¶ 118} I dissent from the majority decision because I agree with Knight that the trial court erred when it denied his motion to suppress statements made after he invoked his right to counsel. I would find his fourth assignment of error well-taken. Moreover, I would find that the error in admitting his statements was not harmless beyond a reasonable doubt, therefore his conviction must be reversed and the matter remanded to the trial court for a new trial.

{¶ 119} The majority properly concludes that Knight clearly and unambiguously invoked his right to counsel when he said, "I need my lawyer, man. Can I get a lawyer?"

49.

But I disagree with its characterization that Holskey "stopped" the interrogation upon Knight's request for an attorney. Holskey did not stop the interrogation; he merely paused—strategically—to "give it a couple seconds and just see how it goes." He conceded at the suppression hearing that he did this because he has learned over the years that this sometimes prompts a suspect to continue talking. Moreover, as part of this tactic, Holskey did not just quietly remain in the room. He consoled Knight ("It's okay. It is okay."), stared at him expectantly as if waiting for him to speak, rubbed his shoulder sympathetically, and reassured him that he is "not a bad person."

{¶ 120} The U.S. Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), recognized that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words *or actions* on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Emphasis added.) The Court explained that "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect" constitutes "interrogation." *Id.*

{¶ 121} Here, the majority finds that Holskey did not "expressly question" Knight after he invoked the right to counsel, and did not engage in the "functional equivalent of express questioning." It concludes that "Holskey's act of remaining quiet and looking at Knight for a few seconds, although effective for giving him the opportunity to speak, was not itself coercive such that it was 'reasonably likely to elicit an incriminating response.'" In reaching these conclusions, the majority entirely ignores Holskey's testimony that the

50.

very reason he did not get up and leave after Knight invoked the right to counsel was because experience has taught him that a suspect may reverse course and start talking again if he just "give[s] it a couple seconds." As such, I would find that Holskey knew that the tactics employed here were not just reasonably likely to evoke an incriminating response from Knight, they were *designed* to do so. Knight's motion to suppress should have been granted, thus the trial court erred when it admitted statements made by Knight after he invoked the right to counsel.

{¶ 122} After Knight invoked the right to counsel, he confessed that he stabbed the victim twice. The U.S. Supreme Court has recognized that "[a] confession is like no other evidence." *Arizona v. Fulminante,* 499 U.S. 279, 296 (1991). "Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Id.,* quoting *Bruton v. United States,* 391 U.S. 123 139-140 (1968) (White, J., dissenting). "'[C]onfessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.'" *Id.,* quoting *Bruton* at *id.* (White, J., dissenting). A reviewing court must "exercise extreme caution before determining that the admission of the confession at trial was harmless." *Id.* To that end, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967)

{¶ 123} Here, Knight's confession was the State's most crucial piece of evidence. It left Knight with no alternative but to claim—unsuccessfully—self-defense. The only

51.

other witness who directly implicated Knight in the murder had been intoxicated to the point of vomiting, presented officers with false identification, and had also fought with the victim. Under these circumstances, I would find that the error in admitting Knight's statements was not harmless beyond a reasonable doubt. I would reverse and remand for a new trial.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.